[S.F. No. 22313. In Bank. July 8, 1969.]

EVA BARRERA, Plaintiff, Cross-defendant and Appellant, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant, Cross-complainant and Respondent.

Boccardo, Blum, Lull, Niland, Teerlink & Bell and Edward J. Niland for Plaintiff, Cross-defendant and Appellant.

Edward I. Pollock, Robert E. Cartwright, Theodore A. Horn, Robert G. Beloud, Leo M. O'Connor and Leonard Sacks as Amici Curiae on Behalf of Plaintiff, Cross-defendant and Appellant.

Nagle, Vale & McDowall, Vernon V. Vale and Robert A. Seligson for Defendant, Cross-complainant and Respondent.

TOBRINER, J.—Plaintiff sued State Farm Mutual Automobile Insurance Company (hereinafter "State Farm") to compel payment of a judgment obtained against Anthony and Sandra Alves. Plaintiff obtained the judgment against the Alveses on the ground that plaintiff, while a pedestrian, was injured by Mrs. Alves's negligent driving. Plaintiff alleged and urged the enforceability at the time of the accident of an automobile liability policy issued by State Farm to the Alveses. State Farm denied the validity of the policy, and filed a cross-complaint seeking a declaration that the policy was void *ab initio* because issued in reliance on a material misrepresentation by Mr. Alves. In opposition, plaintiff contended that State Farm was estopped to rescind the policy six months after the accident because State Farm led Mr. Alves to believe that he was insured and because State Farm negligently failed to discover within a reasonable time the misrepresentation in the application tendered one and one-half years prior to the accident.

The trial court found that State Farm issued the automobile liability policy in reliance on a material misrepresentation, that rescission was therefore justified, and that State Farm acted promptly *upon discovery* of the misrepresentation. Accordingly, the court entered judgment for State Farm on both the complaint and the cross-complaint. Plaintiff moved for a new trial, urging that the public policy expressed in California's Financial Responsibility Law impelled a finding of laches by State Farm in its belated discovery of the

misrepresentations; that its failure to act promptly worked to the detriment of an innocent member of the public, who should therefore recover against the carrier. The trial court denied the motion.[1] Plaintiff appeals.[2]

We conclude that an automobile liability insurer must undertake a reasonable investigation of the insured's insurability within a reasonable period of time from the acceptance of the application and the issuance of a policy. This duty directly inures to the benefit of third persons injured by the insured. Such an injured party, who has obtained an unsatisfied judgment against the insured, may properly proceed against the insurer; the insurer cannot then successfully defend upon the ground of its own failure reasonably to investigate the application. On retrial, therefore, plaintiff, upon showing that State Farm did not, within a reasonable time, reasonably investigate the insured's insurability, may recover from State Farm, within the policy limits, the amount of the judgment she obtained against the Alveses.[3]

---

[1]The trial court relied upon the propositions that a party to a contract may rescind if it acts promptly after discovering the misrepresentation, and that the injured person's rights cannot rise higher than those of the insured. In explaining why he refused to consider plaintiff's contention that an automobile liability insurer owes a duty, based on public policy, to undertake a reasonable investigation of an insured within a reasonable time, the trial judge stated: "I feel that this is a matter of policy; I would certainly urge you to appeal, and it would not offend me in the least if I were reversed, because I think maybe it is an area that needs clarification. The Court is aware that policies are to be construed liberally, that they are to be construed against the insurance company wherever there is any ambiguity, but the contract was not between [plaintiff and State Farm], it was between Mr. Alves [and State Farm].

"Now, there may be *a question of law* which the upper court might reverse me on *as to the duty of the insurance company, . . .*" (Italics added.)

[2]The Alveses are not a party to this appeal.

[3]In addition to arguing that State Farm was estopped to rescind the policy because of negligent failure to discover the misrepresentation within a reasonable time, plaintiff also argued that section 651 of the Insurance Code applied to rescission as well as to prospective cancellation of automobile insurance policies, and that therefore the attempted rescission did not take effect until 10 days after notice of the rescission was sent to Mr. Alves. If termination of the policy did not occur until after notice, the policy remained in effect at the time of the accident.

Plaintiff's contention regarding section 651 runs counter to the statutory scheme for termination of insurance contracts and blurs the clear statutory distinction between "rescission" (retroactive termination) and "cancellation" (prospective termination) of insurance policies. Section 651 provides: "Notwithstanding any other provision of this code, no cancellation by an insurer of an auto liability insurance policy shall be effective prior to the mailing or delivery to the named insured at the address shown in the policy, of a written notice of the cancellation stat-

The parties stipulated to the following facts: On April 29, 1958, Mr. Alves signed an application for automobile insurance prepared by Mr. Pucci, State Farm's agent, and on that same date, State Farm issued a policy insuring Alves against public liability for $10,000, for any one person's injury. Alves paid premiums on the policy in April 1958, October 1958, and April 1959. On November 28, 1959, Mrs. Alves, while driving a Lincoln automobile, struck plaintiff. On December 4, 1959, plaintiff's attorneys notified State Farm of plaintiff's claim. On December 8, 1959, State Farm sent a reply letter to plaintiff's attorneys. On April 22, 1960, State Farm rescinded the insurance policy and returned all premiums paid. On July 26, 1960, plaintiff sued the Alveses, and Alves forwarded a copy of the summons and complaint to State Farm. On August 2, 1960, State Farm advised the Alveses that it would not defend the action. On November 3,

---

ing when, not less than ten (10) days after the date of such mailing or delivery, the date the cancellation shall become effective.''

The Legislature added section 651 in 1957. (Stats. 1957, ch. 723, § 1, p. 1931.) In 1957, the Insurance Code did not contain a separate chapter on ''Cancellation'' (present ch. 10). Section 651 was incorporated into the ''Rescission'' chapter (ch. 9). The Legislature did not insert the section in the ''Cancellation'' chapter when that chapter was added by 1965 Statutes, chapter 1716, section 1, page 3850. The Insurance Code specifically provides, however, that ''Division, part, chapter, article, and section headings contained herein shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning, or intent of the provisions of any division, part, chapter, article or section hereof.'' (§ 6.)

The statutory scheme reflects a deliberate distinction between ''rescission'' and ''cancellation.'' Sections 331, 338, and 359, which prescribe the grounds for rescission, all involve false statements or material omissions in the procurement of the policy. Section 660 (Stats. 1965, ch. 1716, § 1, p. 3850), on the other hand, provided: ''The commissioner, by regulation, shall prescribe the grounds upon which an insurer may cancel a policy of automobile insurance. No insurer shall cancel a policy of automobile insurance except upon such ground or grounds as have been prescribed by the commissioner.'' (Repealed, Stats. 1968, ch. 137, p. 352, § 1, effective Jan. 1, 1969.)

Unless we say that automobile liability insurance policies cannot be rescinded at all and that section 660 completely abrogated the rescission section for automobile liability insurance, we must hold that section 651, which specifically refers to ''cancellation,'' does not control the procedure for ''rescission'' of automobile liability insurance. Instead, the general section governing rescission of insurance policies, section 650, applies. Section 650 provides: ''Whenever a right to rescind a contract of insurance is given to the insurer by any provision of this part such right may be exercised at any time previous to the commencement of an action on the contract.'' The issue, then, turns on the validity of plaintiff's contention that the public policy of this state requires that an automobile liability insurer reasonably investigate within a reasonable time after issuance of the policy or otherwise be estopped to rescind the policy, at least in an action by an injured person who has obtained judgment from the insured.

1960, judgment was entered in favor of plaintiff against the Alveses.

The parties further stipulated that plaintiff did not consent to, or concur in, any rescission or attempted rescission between State Farm and the Alveses. They further agreed that on September 6, 1958, five months after the issuance of the original policy, State Farm paid to, or on behalf of, Mr. Alves a claim arising out of the comprehensive coverage provisions of the policy in effect at that time.

The record discloses the following facts as to the application for insurance and the misrepresentations. In April 1958 Mr. Alves purchased a Chevrolet from one Roberti, a used-car salesman. Roberti arranged with Pucci, State Farm's agent, that he come to the agency in order to obtain insurance for Alves's car. Both Alves, who was 24 years old at the time, and Pucci testified that Alves did not read the application, and that Pucci filled in the answers to the questions.

Question 18 on the application stated: "Has your license to drive or registration been suspended, revoked or refused, to the applicant or any member of his household in the last five years?" Contrary to the Department of Motor Vehicles (hereinafter "DMV") report on Mr. Alves which evidenced one suspension and two probation orders within the five years preceding April 1958, a "No" answer appeared on the application in response to question 18.

Alves testified that Pucci did not call this question to his attention and, further, that he showed Pucci his driver's license, which bore a "Probation" stamp on it. Pucci testified that although he did not specifically recall asking this question, he always, as a matter of practice, made such an inquiry and a related one concerning prior cancellations of insurance. Pucci further testified that he did not see Alves's driver's license, and that he could not remember the manner in which he obtained the license number that he had included in the application. ██ Considered as a whole, the evidence as to whether or not Alves misstated his past driving record to Pucci is conflicting: we must therefore accept the trial court's finding of misrepresentation.[4]

---

[4]Alves's response to question 18 on the application constitutes "concealment" sufficient to justify rescission under Insurance Code section 331. That section explicitly states, and the cases construing it so hold, that the misrepresentation involved need not be intentional in order to justify rescission. Furthermore, whether the insured misstated or concealed certain facts with the intention to deceive the insurer is irrelevant to the

Alves and Pucci further testified that in November 1959, prior to the accident injuring plaintiff, Alves called Pucci and requested a transfer of his policy to a Lincoln automobile which he had just purchased. In reliance on the April 1958 application, Pucci filled in the transfer application. Following company practice, Pucci did not require that Alves sign the application.

Maurice Hammer, an insurance broker for the previous two years, and prior thereto an agent for Allstate Insurance for three years, testified that the general custom and practice of the insurance industry was to obtain DMV reports in connection with applications, either as a basis for determining rates or insurability of the risk.

With respect to State Farm's policy on initial applications, Pucci testified that State Farm always issued a policy when he gave a binding receipt to the applicant. The binding receipt provided for insurance coverage for 30 days from the date of the receipt, even if the company subsequently refused to approve the risk. Pucci handed Alves a binding receipt on April 28, 1958.

Daniel Priest, an underwriting superintendent of State Farm, testifying as to State Farm's investigative policies, stated that State Farm orders DMV reports and makes other inspections "on a judgment basis." In some cases State Farm does check on statements made by its applicants; but "in other cases the underwriting people just passed on the risk based on the statement on the application as submitted." In response to the question whether State Farm customarily checks the driving record of an insured when a claim is presented against him, Priest stated: "Again, it depends upon the nature of the claim, the type of claim situation, circumstances involved, things of this nature. . . . We don't have any fixed custom or practice." He further stated that once a claim has occurred, the claims, rather than the underwriting, department, determines whether the claim is sufficiently "significant" to warrant an investigation. Before any claim has

right to rescind. (See, *Telford* v. *New York Life Ins. Co.* (1937) 9 Cal.2d 103, 105 [69 P.2d 835].)

Indeed, the trial court in the present case found only that Alves materially misrepresented facts within his knowledge; there was no finding of *scienter*, that Alves fraudulently misrepresented the facts. Thus, under the present interpretation of the Insurance Code, an insurer may rescind the contract of insurance *ab initio* for a material misrepresentation—even though the insured's misstatements were the result of negligence, or, indeed, the product of innocence.

been made against the insured, the underwriter handling the file exercises the discretion to decide whether to obtain a DMV report. Priest further testified that the cost of an entire investigation in 1958 was $3.35, and that the cost of a DMV check was only 25 cents.

Although at the time of his application in April 1958 Alves, then being under 25 years of age, fell within the class of applicants who received the greatest number of spot checks, State Farm did not begin its investigation until February 4, 1960, more than two months after plaintiff was injured, and almost two years after the initial application. After discovering that Alves's file did not contain a DMV report, the underwriting department requested one. On February 12, 1960, it received a reply from the department; on March 2, 1960, it obtained the report. Prior to obtaining the report, and in response to an underwriter's question whether to cancel Alves's policy, the claims department on February 16 responded that it was in the process of developing evidence for rescission. On April 22, State Farm notified Alves of the rescission of his policy.

The evidence suggests that State Farm, in failing to investigate Alves's insurability and to obtain a DMV report, pursued a policy of saving minor costs on its part at the expense and sacrifice of the interests of its insured and those of the general public who were the potential victims of the insured's negligence. If, at the time of an initial or transfer application, the underwriter handling the risk relies on the application and fails to order a DMV report, the claims department thereafter determines whether a claim by or against an insured is sufficiently "significant" to warrant investigation. Here, State Farm must have considered Mr. Alves's September 6, 1958, claim under the comprehensive provisions of his policy "insignificant," since State Farm apparently did not investigate but paid the claim. Not until plaintiff's attorneys notified State Farm of a $10,000 claim under the personal liability provision of the policy did State Farm attempt to check Alves's driving record.

State Farm's investigative practices may fail to conform to the standard of service which the public may reasonably expect of an insurance company and, more importantly here, may violate the public policy underlying California's Financial Responsibility Law. As we explain hereinafter in more

detail, the "quasi-public" nature of the insurance business[5] and the public policy underlying the Financial Responsibility Law (see fn. 9, *infra*) impose upon the automobile liability insurer a duty both to the insured and to the public to conduct a reasonable investigation of insurability within a reasonable time after issuance of an automobile liability policy. We may characterize this duty as one sounding either in tort or quasi-contract.[6] The label is not important. We hold, how-

[5] "It has long been recognized that 'the business of insurance is *quasi public* in character' . . .

"The purpose and nature of [life] insurance [contracts], and the duties which the insurer assumes under such contracts, and the manner in which such contracts are negotiated, impress such contracts and the relationship of the parties, even during the negotiations, with characteristics unlike those incident to contracts and negotiations for contracts in ordinary commercial transactions." (*Bekken* v. *Equitable Life Assur. Soc.* (1940) 70 N.D. 122 [293 N.W. 200, 210-212, 128 A.L.R. 1150]; see also *Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 270, 280 [54 Cal.Rptr. 104, 419 P.2d 168]; *Steven* v. *Fidelity & Cas. Co.* (1962) 58 Cal.2d 862, 882-883 [27 Cal.Rptr. 172, 377 P.2d 284]; *Glickman* v. *New York Life Ins. Co.* (1940) 16 Cal.2d 626, 633-635 [107 P.2d 252, 131 A.L.R. 1292]; *Stark* v. *Pioneer Cas. Co.* (1934) 139 Cal.App. 577, 580 [34 P.2d 731]; *Duffy* v. *Bankers' Life Ass'n of Des Moines* (1913) 160 Iowa 19 [139 N.W. 1087, 1089-1090, 46 L.R.A. N.S. 25]; *Republic Nat. Life Ins. Co.* v. *Chilcoat* (Okla. 1961) 368 P.2d 821, 824; *Dyer* v. *Missouri State Life Ins. Co.* (1925) 132 Wash. 378 [232 P. 346, 347-348]; cf. *German Alliance Ins. Co.* v. *Kansas* (1914) 233 U.S. 389, 411-415 [58 L.Ed. 1011, 1021-1023, 34 S.Ct. 612, L.R.A. 1915C 1189]; see generally, 12 Appleman, Insurance Law and Practice (1943) § 7226, at pp. 326-327, 330; Funk, *The Duty of an Insurer to Act Promptly on Applications* (1927) 75 U.Pa. L.Rev. 207, 215, 222-223; Kessler, *Contracts of Adhesion—Some Thoughts about Freedom of Contract* (1943) 43 Colum.L.Rev. 629, 631-632, 637, 641-642; Comment, *Responsibility of Insurer for Delay in Acting on Application* (1930) 40 Yale L.J. 121, 127.)

[6] "[T]he insurer [may be] under a duty entirely irrespective of contract, one which the law imposes regardless of the company's desire to assume it. *Whether this duty be called one of tort or of quasi-contract is immaterial.* In either case, its fundamental feature is its non-consensual nature. *It is a duty peculiar to the business of insurance,* and does not extend beyond it." (Funk, *The Duty of an Insurer to Act Promptly on Applications, supra,* 75 U.Pa.L.Rev. 207, 224.) (Italics added.)

Similarly, the court in *Kukuska* v. *Home Mut. Hail-Tornado Ins. Co.* (1931) 204 Wis. 166 [235 N.W. 403], in discussing an insurer's duty to act promptly on an application (see text accompanying fn. 10, *infra*), explained: "If the insurer is under such a duty and fails to perform the duty within a reasonable time and, as a consequence, the applicant sustains damage, *it is not vastly important that the legal relationship be placed in a particular category.* If we say it is contractual, that is, there is an implied agreement under the circumstances on the part of the insurer to act within a reasonable time, or, having a duty to act, the insurer negligently fails in the performance of that duty, or that the duty springs out of a consensual relationship, and is therefore in the nature of a quasi contractual liability, is not vitally important." (*Id.* at p. 405.) (Italics added.)

ever, that in order to avoid liability to an innocent victim of the insured an insurer cannot take advantage of a breach of its duty reasonably to check an application for automobile liability insurance within a reasonable time after acceptance of that application.[7]

1. *An automobile liability insurer incurs a duty reasonably to investigate an insured's insurability within a reasonable time after issuance of the policy.*

a. *The insurer's role as a public service entity*

Because of the "quasi-public" nature of the insurance business and the relationship between the insurer and the insured (see fn. 5, *supra*), the rights and obligations of the insurer cannot be determined solely on the basis of rules pertaining to private contracts negotiated by individual parties of relatively equal bargaining strength. In the case of the standardized contract prepared by the economically powerful entity and the comparatively weak consumer we look to the reasonable expectation of the public and the type of service which the entity holds itself out as ready to offer.[8]

The reasonable expectation of both the public and the insured is that the insurer will duly perform its basic commitment: to provide insurance. (*Glickman* v. *New York Life Ins. Co., supra,* 16 Cal.2d at pp. 634-635.) "Insurance companies are engaged in the business of running risks for pay; . . ." *Guardian Life Ins. Co.* v. *Weiser* (1941 S.Ct. Spec. Term) 51

---

[7]That a person seeking to avoid liability by relying on material misrepresentation occurring prior to the plaintiff's acquisition of a cause of action must show due diligence in discovering that misrepresentation is a well-recognized equitable principle. "The rule is well established that the means of knowledge is equivalent to knowledge, and that a party who has the opportunity of knowing the facts constituting the fraud of which he complains cannot be supine and inactive, and afterwards allege a want of knowledge that arose by reason of his own laches or negligence." (*Shain* v. *Sresovich* (1894) 104 Cal. 402, 405 [38 P. 51]; *Consolidated Reservoir & Power Co.* v. *Scarborough* (1932) 216 Cal. 698, 701-702 [16 P.2d 268].) Thus, if a person has a duty to make inquiry, but unreasonably delays in conducting that inquiry which would reveal the fraud, his negligent omission constitutes laches which bars his defense of fraud. (See *Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 438 [159 P.2d 958].)

[8]As we explained in *Gray* v. *Zurich Ins. Co., supra,* 65 Cal.2d at page 269: "Obligations arising from [an insurance] contract inure not alone from the consensual transaction but from the relationship of the parties." Quoting from Pound, The Spirit of Common Law (1921) page 29, we further explained that " 'we have taken the law of insurance practically out of the category of contract, and we have established that the duties of public service companies are not contractual, as the nineteenth century

N.Y.S.2d 771, 773; cf. *Casey* v. *Proctor* (1963) 59 Cal.2d 97, 111 [28 Cal.Rptr. 307, 378 P.2d 579] : "[I]f the releaser is bound by the literal terms of the release, it has been recognized that he is left to suffer personal injuries without compensation, while the releasee, who usually is an insurer, has received a windfall in avoiding liability for a risk it has been paid to assume.")

With respect to an insurance policy voidable under the Insurance Code, if an automobile liability insurer can perpetually postpone the investigation of insurability and concurrently retain its right to rescind until the injured person secures a judgment against the insured and sues the carrier, then the insurer can accept compensation without running any risk whatsoever. Such a rule would permit an automobile liability insurer to continue to pocket premiums and take no steps at all to probe the verity of the application for the issued policy unless and until the financial interest of the insurer so dictated. Furthermore, under such a rule, the carrier would be permitted to deal with the insured as though he were insured, and thus to lead him to believe that he was in fact insured.

b. *The public policy underlying the financial responsibility law*

A rule which would permit an automobile liability insurer indefinitely to postpone determination of the validity of a liability policy and to retain its right to rescind the policy in the absence of the filing of a suit against it by a judgment creditor of the insured, defeats not only the public service obligations of the insurer but also the basic policy of the Financial Responsibility Law.[9] That law aims "to make

sought to make them, but are instead relational; they do not flow from agreements which the public servant may make as he chooses, they flow from the calling in which he has engaged and his consequent relation to the public." (*Id.* at p. 270, fn. 6.)

Similarly, in *Bekken* v. *Equitable Life Assur. Soc.*, *supra*, 293 N.W. at page 213, the court stated: " 'The subject [of insurance] is *sui generis*, and the rules of a legal system devised to govern the formation of ordinary contracts between man and man cannot be mechanically applied to it.' *Pfiester* v. *Missouri State Life Ins. Co.*, 85 Kan. 97 [116 P. 245, 247]."

[9]See Vehicle Code section 16000 et seq. As we explained in *Simmons* v. *Civil Service Emp. Ins. Co.* (1962) 57 Cal.2d 381, 385 [19 Cal.Rptr. 662, 369 P.2d 262], "Although our laws do not require as a condition of obtaining an operator's license that any showing be made by an applicant as to his financial responsibility to respond in damages if, through his negligence in the operation of an automobile, he caused injuries to

owners of motor vehicles financially responsible to those injured by them in the operation of such vehicles." (*Wildman* v. *Government Emp. Ins. Co.* (1957) 48 Cal.2d 31, 39 [307 P.2d 359].) ▮ Thus we have uniformly held that "the *entire* automobile financial responsibility law must be liberally construed to foster its main objective of giving 'monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer grave injury through the negligent use of those highways by others.' " (*Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 153 [23 Cal.Rptr. 592, 373 P.2d 640], quoting from *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 434 [296 P.2d 801, 57 A.L.R.2d 914].) As we concluded in *Interinsurance Exchange, supra,* "The pattern is clearly discernible: a desire on the part of the judiciary and the Legislature to not only prevent the astronomical accident toll in this state, but also to provide compensation for those injured through no fault of their own." (*Id.* at p. 154.)[10]

A rule permitting an automobile liability insurer indefinitely to postpone its investigation of insurability until such time as it is financially opportune to do so directly thwarts a chief purpose of the Financial Responsibility Law: to "pro-

---

the persons or property of others, nevertheless provisions are contained therein whereunder, after such injuries have been inflicted through his negligence, the licensed operator is required to afford financial responsibility in favor of those who have been injured by his conduct and upon his failure to do so the statutes provide for the suspension of his operator's license and for other sanctions, *all intended,* through threat of the imposition of such sanctions, *to result in the affording of limited financial relief to the injured.*" (Italics added.) (See generally, Grad, *Recent Developments in Automobile Accident Compensation* (1950) 50 Colum.L.Rev. 300, 305-308; Kimball, *The Purpose of Insurance Regulation: A Preliminary Inquiry into the Theory of Insurance Law* (1961) 45 Minn.L.Rev. 471, 512-514; Murphy & Netherton, *Public Responsibility and the Uninsured Motorist* (1959) 47 Geo.L.J. 700, 701-702, 706; Comment, *The Financial Responsibility Laws* v. *Liability Insurance Cancellation* (1968) 41 So.Cal.L.Rev. 367-372.)

[10]Following the policy clearly enunciated by this court in *Interinsurance Exchange, supra,* the court in *Hanover Ins. Co.* v. *Carroll* (1966) 241 Cal.App.2d 558 [50 Cal.Rptr. 704], construed the 30-day notice provision in the uninsured motorist statute (Ins. Code, § 11580.2) in light of the general rule that failure to give notice promptly as required by an insurance policy does not bar recovery on the policy unless the insurer can prove that he was prejudiced by the delay. Thus, not only contractual provisions in, but also statutory provisions governing, automobile insurance policies must be construed in light of the basic public policy underlying the Financial Responsibility Law. (See, *State Farm Mut. Auto. Ins. Co.* v. *Wall* (1966) 92 N.J. Super. 92 [222 A.2d 282], a case involving facts quite similar to those in the present case.

vide compensation for those injured through no fault of their own.'' Automobile liability insurance differs from ordinary indemnity insurance, which primarily protects the insured and which may not be available to an applicant if the carrier decides he is not an insurable risk. As the Financial Responsibility Law and the several cases construing it demonstrate, the state has provided legislative protection for those who suffer injury or death on the highway from financially irresponsible drivers. That policy is evidenced also by the Assigned Risk Plan (Ins. Code, § 11620 et seq.) which assures liability insurance, although at higher rates, for any automobile owner who would be required to furnish proof of financial responsibility by section 16430 of the Vehicle Code. This policy of protecting the public by an assurance of financially responsible automobile owners finds further expression in the requirement that liability policies must contain a provision that the insolvency or bankruptcy of the insured will not release the insurer from liability under the policy. (Ins. Code, § 11580, subd. (b)(1); *Johnson* v. *Holmes Tuttle Lincoln-Mercury, Inc.* (1958) 160 Cal.App.2d 290, 298 [325 P.2d 193].)

The public policy expressed in the Financial Responsibility and related laws requires that we construe statutes applicable to automobile liability insurance policies, as well as contractual provisions in those policies, in light of its purpose to protect those who may be injured by the use of automobiles. (See fn. 10, *supra*.) We therefore cannot accept a construction of the statute governing rescission of insurance policies, insofar as it applies to automobile liability insurers, which would serve only the financial interest of the insurer and directly thwart that public policy.

State Farm's alleged practice of postponing its investigation of insurability until after the assertion of a ''significant'' claim produces the dangerous condition that owners of cars will be driving on the streets and highways in the erroneous belief that they are insured and that the public generally will utilize these streets and highways with the frustrated expectation that insurance companies would conduct their business in such a way as to fulfill, not thwart, the basic purposes of the Financial Responsibility Law. This latter expectation can only be fulfilled, however, by recognition of the duty of the automobile liability insurer to undertake within a reasonable time from issuance of the policy a rea-

sonable investigation of insurability and by penalizing the breach of that duty by loss of the right of rescission.

c. *The insurer's analogous extra-contractual duty to act promptly on applications*

California has developed a line of decisions imposing a duty upon all insurers to act promptly upon an application for insurance.[11] The rationale underlying the extra-contractual imposition of this duty parallels the philosophy underlying the Financial Responsibility Law and related statutory and judicial rules governing automobile liability insurance.

The rule that an insurer must act promptly finds its source in the quasi-public nature of the insurance business and the reasonable expectation of the applicant and the general public. "Since insurance companies are held to a broader legal responsibility than are parties to purely private contracts, having solicited and obtained an application for insurance. and having received payment of a premium, they are bound either to furnish indemnity or decline to do so within a reasonable time." (12 Appleman, Insurance Law and Practice, *supra*, § 7226, at p. 330; see also Funk, *The Duty of an Insurer to Act Promptly on Applications, supra,* 75 U.Pa.L.Rev. 207, 222, 224.)

The following analysis of the insurer's duty to act promptly upon an application applies directly to the insurer's analogous duty to conduct with due diligence a reasonable investigation after issuance of the policy of insurability: "Before one can hold himself out as competent to transact the business of insurance he must have fully complied with the statutes of the state relating to insurance. . . . By the soliciting, making and receiving of the application, the parties had entered into some kind of a consensual relationship. . . .

"Under such circumstances, having in view the nature of the risk against which the insure[d] seeks protection, is there not a duty upon the insurer to act upon the application within a reasonable time? *Can the insurer, having pre-empted the field, retain control of the situation and the applicant's funds indefinitely? Does not the very nature of the transaction impose upon the insurer a duty to act?"* (*Kukuska* v. *Home*

---

[11]*Snyder* v. *Redding Motors* (1955) 131 Cal.App.2d 416 [280 P.2d 811]; *Smith* v. *Minnesota Mut. Life Ins. Co.* (1948) 86 Cal.App.2d 581 [195 P.2d 457]; *Stark* v. *Pioneer Cas. Co., supra,* 139 Cal.App. 577.

674

*Mut. Hail-Tornado Ins. Co., supra,* 235 N.W. 403, 405.) (Italics added.)

Similarly, the rationale below applies as much to the insurer's obligation to investigate insurability after issuance of a policy as to its duty to act promptly on applications: "It strikes us as manifestly unfair to hold a stipulation in an application for insurance that the company is not bound until the application is received and approved, as warranting an insurance company to delay consummating a contract of insurance for an unreasonable length of time, and then in the event of loss repudiate it. It is in just such situations as this that the insured is allowed, in the event of loss, to recover damage for negligence based upon unreasonable delay. . . . Any other rule would place it in the power of an insurance company to take the chances of a loss, and, if none occurred, retain the premium; but if one does occur, repudiate the contract and compel the assured to bear the loss." (*Security Ins. Co.* v. *Cameron* (1922) 85 Okla. 171 [205 P. 151, 159-160, 27 A.L.R. 444]; cf. *Guardian Life Ins. Co.* v. *Weiser, supra,* 51 N.Y.S.2d 771, 773.)

Our conclusion that an automobile liability insurer incurs the duty to conduct a reasonable investigation of insurability within a reasonable period of time after issuance of the policy, paralleling the line of decisions that hold that an insurer has a duty to act promptly on applications, "recognize[s] facts to be what they are. They do not attempt to force the facts to fit a ready-made legal mold. They recognize the status and relationship of the parties, as they are, and measure the obligations of the parties accordingly." (*Bekken* v. *Equitable Life Assur. Soc., supra,* 293 N.W. 200, 210; *Stark* v. *Pioneer Cas. Co., supra,* 139 Cal.App. 577, 580; *Duffy* v. *Bankers' Life Assn. of Des Moines, supra* 139 NW. 1087, 1089.)

2. *The automobile liability insurer's duty to investigate insurability after issuance of the policy inures directly to the benefit of third persons injured by the insured*

The requirement that the carrier act promptly to determine insurability after issuance of an automobile liability insurance policy inures primarily to the benefit of those members of the public who suffer injury from negligent motorists and seek recovery against the responsible tortfeasors.[12] The duty arises

---

[12]As the court said in *Bekken* v. *Equitable Life Assur. Soc., supra,* 293 N.W. at page 218, in regard to the failure of a life insurance carrier to act promptly upon an application, "In certain circumstances a con-

from the public policy that protects the innocent victim of the careless use of automobiles from an inability to sue a financially responsible defendant. This duty, which the insurer incurs with the issuance of an automobile liability policy, therefore runs directly to the class of potential victims of the insured.[13] Consequently, when the insurer breaches that duty, it may not defeat recovery by the injured person, who has recovered a judgment against the insured, by relying on an untimely attempt to rescind.

The proposition that a party to a contract may owe a duty of care to a third person not in privity with either party to the contract is not new. (See Prosser, The Law of Torts (3d ed. 1964) pp. 658-661.) ▮ Nor can we doubt that a third person not in privity of contract with the defendant may recover for the defendant's breach of a duty arising out of a contract with a second party when the only risk of harm created by that breach of duty affected an intangible interest. (*Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 649 [320 P.2d 16, 65 A.L.R.2d 1358] ; *Walnut Creek Aggregates Co.* v. *Testing Engineers, Inc.* (1967) 248 Cal.App.2d 690, 696 [56 Cal.Rptr. 700] ; *Glanzer* v *Shepard* (1922) 233 N.Y. 236 [135 N.E. 275, 23 A.L.R. 1425].) ▮ As we said in *Merrill* v. *Buck* (1962) 58 Cal.2d 552, 561-562 [25 Cal.Rptr. 456, 375 P.2d 304] : ''Privity of contract is not necessary to establish the

---

tract may create such a relation between a party to a contract, and a third person not a party to the contract that failure or neglect in performance of the contracted duty, may bring into being a cause of action in favor of such third person and against the contracting party who failed to perform his contracted duty.'' (See 12 Appleman, Insurance Law and Practice, *supra*, § 7232.)

[13]In *Johnson* v. *Holmes Tuttle Lincoln-Mercury, Inc., supra,* 160 Cal. App.2d 290, the defendant, as part of a purchase agreement with the buyers of a new car, promised to procure ''full coverage'' insurance for the car. The plaintiff obtained a judgment against the buyers on the ground that he was injured as a result of negligent operation of the car. The court held that the plaintiff was a third party beneficiary of the promise to procure the insurance. ''The parties [to a contract] are presumed to intend the consequences of a performance of the contract. It is held that a person injured may sue on a contract for the benefit of all members of the public who are so injured since the happening of the injury sufficiently determines his identity and right of action. . . .

''The statute [Ins. Code, § 11580] is a part of every policy and creates *a contractural relation which inures to the benefit of any and every person who might be negligently injured by the insured as completely as if such injured person had been specifically named in the policy.* [Citations.] *The primary purpose of the statute is to protect an injured person when the insured is bankrupt- or insolvent.* [Citation.] . . . The statute . . . makes the benefit of the policy available to the creditor beneficiary tortfeasee. (See 27 Cal.L.Rev. 497, 529.) '' (160 Cal.App.2d at pp. 297-298.)

existence of a duty to exercise ordinary care not to injure another, but such duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a duty.''

In *Biakanja* v. *Irving, supra,* 49 Cal.2d 647, 650, we held that a notary public who negligently failed to direct proper attestation of a will became liable in tort to an intended beneficiary damaged ,because of the invalidity of the instrument. In analyzing the bases for this duty, we said, ''The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.''

In *Lucas* v. *Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685], we extended the *Biakanja* rationale to the attorney-client relationship and held that an attorney who negligently drafted a will could be held liable to a person named in the will who suffered deprivation of benefits as a result of the negligence.

More recently, in *Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609], we held that the *Biakanja* criteria applied in the context of residential tract development; we concluded that a lending institution which financed and ''shared in the control'' of the tract development, and which ''cooperated'' with the developer in that undertaking, incurred liability in tort to the buyers of improperly built houses. We said that the lending institution owed a duty to the purchasers ''to exercise reasonable care to prevent the construction and sale of seriously defective homes.'' (69 Cal.2d at p. 867.)

 Similar considerations in the present case impel the holding that the automobile liability insurer incurs a direct duty to those members of the public, situated as the plaintiff, who stand to benefit from the validity of a contract of insurance which protects them against the risk of their own injury or death. Public policy requires the recognition of this duty; without its imposition a basic purpose of the Financial Responsibility Law would be significantly thwarted and persons

such as the plaintiff would remain without an effective remedy for a loss incurred through no fault of their own.

*3. If the automobile liability insurer breaches a duty owing directly to the class of persons of which the plaintiff is a member, plaintiff does not "stand in the shoes of" the insured*

State Farm contends that the "rule" that an injured person "stands in the shoes of" the insured bars the injured person's recovery against the insurer when the insured procured the policy through misrepresentation. It argues that the Alveses could not compel it to pay them if they had satisfied the judgment obtained by plaintiff, and that therefore plaintiff lacks any basis upon which to sue it on the policy.[14]

State Farm's contention overlooks the fact that the automobile liability insurer's duty to conduct a reasonable investigation of insurability with due diligence inures directly to the benefit of persons such as the plaintiff who may be injured by the insured's use of his automobile. Upon the imposition of analogous duties in other contexts, we have held that the real beneficiary of such a duty cannot lose his remedy merely because the party whose relationship with the defendant gave rise to the duty would be barred from recovery.

In *Heyer* v. *Flaig* (1969) 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161], we considered a case in which the intended beneficiaries of a will sought to recover losses incurred because the defendant-attorney breached a duty owed them when he negligently failed to fulfill the testamentary directions of his client. We recognized such a duty in *Lucas* v. *Hamm, supra,* 56 Cal.2d 583, and noted that the duty ran directly in favor of the intended testamentary beneficiaries. In *Heyer,* the defendant invoked the rule that a third party is subject to the same statute of limitations as the promisee to the contract which created the rights of the beneficiary (*Bogart* v. *George K. Porter Co.* (1924) 193 Cal. 197 [223 P. 959, 31 A.L.R. 1045]), and argued that since the testatrix would have been barred by the relevant statute of limitations if she

---

[14]The trial court in the present case rendered no finding that Alves misrepresented his driving record for the purpose of procuring the policy. Indeed, as we have noted above, section 331 of the Insurance Code appears to allow an insurer to rescind regardless of such purpose. Nevertheless, for purposes of considering State Farm's argument, we shall proceed upon the unsupported assumption that Alves intended to procure the policy by means of his misrepresentation.

had lived and brought an action on the date of the plaintiffs' suit, so also must the plaintiffs be barred. We held that the beneficiaries of the duty recognized in *Lucas* are not bound by the statutory period of limitations relevant to the rights of their testatrix; the reason for our holding rested on recognition of the independent nature of the duty of care which accrues directly in favor of the beneficiaries. In holding that the rights of the beneficiary may in some instances rise higher than those of the testator, we recognized that a different rule would frustrate the effective remedial implementation of the duty recognized in *Lucas*.

Likewise, in the instant case, to allow the defendant to raise the defense of the insured's misrepresentation to an action by a person injured by the insured's automobile would frustrate the purpose of the imposition of a duty upon the insurer to undertake a reasonable investigation of insurability within a reasonable time from the acceptance of the application and issuance of the policy. The purpose of the imposition of such a duty is to reduce the number of motorists on our highways who are, in fact, financially irresponsible; the goal is to protect the motoring public generally against the inability to recover compensation for death or injuries caused by automobile accidents. Prompt notice to the insured of the revocation of his policy of insurance will most certainly impel him to seek other means of compliance with the potential requirements of the Financial Responsibility Law. The Assigned Risk Plan (see p. 672, *supra*) provides a guarantee that such means will be available.

If the insurer does undertake a reasonable investigation of insurability, it retains the statutory right granted in section 650 of the Insurance Code to declare the rescission of the policy because of a material misrepresentation of the insured. When the insurer fails, however, to conduct such a reasonable investigation it cannot assert such a right of rescission. The insurer cannot complain of the denial of the statutory right, when its conduct is culpable[15] and directly contributes to the presence on the highway of a financially irresponsible motorist. We can find no case which holds that an injured third party cannot recover from the insurance carrier when the latter fails to conduct a reasonable investigation

[15]See pages 667-668, *supra*.

of insurability within a reasonable time from the issuance of the policy of insurance. In cases which have discussed the scope of the right to rescind under section 650, [16] the injured party seeking to recover against the insurance carrier did not attempt to establish that the carrier acted unreasonably with respect to its duty to conduct an investigation of insurability. These cases are therefore distinguishable from the present case. Nevertheless, to the extent that these cases contain language which conflicts with the holding of the present case, they are hereby disapproved.

The defendant argues further, however, that Mrs. Alves's negligence while driving was the superseding cause of the plaintiff's injury, and that such conduct should insulate it from responsibility. Under the circumstances, Mrs. Alves's negligence cannot be a superseding cause, since "the risk that it might occur was the primary hazard that gave rise to [State Farm's] duty." (*Connor* v. *Great Western Sav. & Loan Assn., supra,* 69 Cal.2d 850, 869.) The defendants in the *Connor* case urged the same defense, based upon the builder's negligence in constructing the defective homes. We cited with approval language from an earlier case which held: "If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby." (*Richardson* v. *Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269].)

In the present case, the basic reason for the imposition of a duty upon the insurer to conduct a reasonable investigation of insurability is the known hazard that innocent members of the public will suffer serious injury and death as a result of automobile accidents. The "likelihood" that the Alveses could become responsible for such an accident was "realizable" by State Farm; indeed, such a hazard is the very risk against which insurance is directed. The purpose of the imposition of

[16]*Emery* v. *Pacific Employers Ins. Co.* (1937) 8 Cal.2d 663, 665 [67 P.2d 1046]; *Civil Service Emp. Ins. Co.* v. *Blake* (1966) 245 Cal.App.2d 196, 198 [53 Cal.Rptr. 701]; *Allstate Ins. Co.* v. *McCurry* (1964) 224 Cal.App.2d 271, 274-276 [36 Cal.Rptr. 731]; *Allstate Ins. Co.* v. *Golden* (1960) 187 Cal.App.2d 506, 513-514 [9 Cal.Rptr. 754]; *Standard Acc. Ins. Co.* v. *Pratt* (1955) 130 Cal.App.2d 151, 156-157 [278 P.2d 489]; *Allstate Ins. Co.* v. *Miller* (1950) 96 Cal.App.2d 778, 782 [216 P.2d 565]; *Olds* v. *General. Acc. Fire etc. Corp.* (1945) 67 Cal.App.2d 812, 821 [155 P.2d 676].

the duty cannot be the avoidance of death or injury to a third person; rather, it is to avoid the possibility that the third person will be unable to obtain compensation for the loss. Thus a duty which results in the improved likelihood that persons responsible for automobile accidents will be financially responsible to those injured cannot be frustrated by the argument that the negligent motorist's culpable conduct is the superseding cause of the harm. The argument ignores " 'the settled rule that two separate acts of negligence may be the concurring proximate causes of an injury. . . .' " (*Connor* v. *Great Western Sav. & Loan Assn., supra,* 69 Cal.2d at p. 870.)

Finally, we point out that this court has rejected a mechanical application of the over-generalization that the rights of the injured person cannot rise above those of the insured. In *Shapiro* v. *Republic Indem. Co.* (1959) 52 Cal.2d 437 [341 P.2d 289], the insurer urged that "an injured person stands in the shoes of the insured and has no greater rights against the insurer than the insured would have had he paid the judgment against him and then sued the insurer" (52 Cal.2d at p. 439). We nevertheless held that the plaintiffs, on suffering their injury, "had an interest that could not be altered or conditioned by independent action of the insurer and the insured. [Citation.] Nor can these rights be conclusively determined against the injured persons in an action to which they were not made parties." (52 Cal.2d at p. 440.) We concluded that a declaratory judgment reforming the policy obtained by the insurer after an accident in which plaintiffs suffered injury, could not defeat the plaintiffs' right of recovery against the insurer upon obtaining judgment against the insured. We granted relief even though, if the insured had paid the judgment and then sued the insurer, the insured could not have recovered under the policy.

The *Shapiro* decision demonstrates that rights of innocent third persons injured by the insured cannot be defeated merely because the insured would not be entitled to indemnity from the insurer if he had satisfied the judgment against him. **[15]** Moreover, the decision implicitly rejects the mechanical rule that the injured person "stands in the shoes of" the insured when application of that proposition defeats a more primary policy underlying the injured person's right of recovery.

*4. Upon satisfaction of a judgment obtained by the injured third party, the automobile liability insurer possesses a remedy against the insured for the latter's misrepresentation*

Failure of the automobile liability insurer reasonably to investigate the insurability of the insured within a reasonable time after issuance of the policy, as described above, results in the loss of the carrier's right to rescind, as opposed to its right to cancel, the policy. Thus, if, in such a case, the insurer has not timely rescinded an automobile liability policy prior to an accident in which the insured negligently injures a third person, the policy necessarily remains in effect at least through the time of the accident; the insurer cannot thereafter rescind, but only cancel the policy. After the injured person has obtained a judgment against the insured, therefore, he may compel the insurer to pay the judgment to the extent of the monetary limits set forth in the Financial Responsibility Law. (Veh. Code, § 16430.)

That the automobile liability insurer that fails to make such an investigation loses its right to rescind does not, however, necessarily mean that it forfeits all remedies *against the insured* for his misrepresentations. The insurer may still prosecute a cause of action against the insured for damages for wrongful misrepresentation, after satisfying the injured person's claim, or, in an action brought by the insured, after he has satisfied a judgment against him by the injured person, defend on the ground of misrepresentations in the application. (Cf., e.g., *De Campos* v. *State Comp. Ins. Fund* (1954) 122 Cal.App.2d 519, 528-529 [265 P.2d 617]). This recognition of the right of the insurer to rely on the insured's misrepresentations either as a basis for a damages suit against the insured or as a defense in an action by the insured does not conflict with the purpose of the Financial Responsibility Law, the assurance of a solvent defendant for those innocently injured by the use of automobiles.

*5. The question whether State Farm negligently breached a duty owed to plaintiff in the present action is a question of fact to be determined on remand*

Whether or not the automobile liability insurer has breached its duty to the public to make a reasonable investigation within a reasonable time after the issuance of the policy ordinarily constitutes a question for the trier of fact. (Cf. *Bekken* v. *Equitable Life Assur. Soc.*, supra, 293 N.W. 200,

213; 12 Appleman, Insurance Law and Practice, *supra,* § 7226, pp. 326-332.) The trial court in the present case awarded judgment for State Farm without reference to this duty. Accordingly, the judgment must be reversed. On remand, the trial court will determine whether or not the insurer conducted such a reasonable investigation. If the court finds that State Farm acted reasonably in light of its duty to undertake a reasonable investigation of insurability, it may allow State Farm once again to assert the invalidity of its contract of insurance with the Alveses as a defense to the plaintiff's action. On the other hand, if the trial court concludes that State Farm breached its duty, as defined in this opinion, the defense of the rescission *ab initio* will no longer be available to State Farm.

Factors to be taken into account by the trial court in assessing the reasonableness of State Farm's course of conduct in failing to investigate. Alves's driving record are, inter alia: the cost of obtaining the information from the Department of Motor Vehicles, the availability of this information from the department or elsewhere (e.g., Alves claimed that his license suspensions appeared on the back of his driver's license), and the general administrative burden of making such an investigation.[17] These factors must be weighed against the importance of the protection of innocent members of the public against the consequences of automobile owners driving with voidable liability policies.

The judgment on plaintiff Barrera's complaint and defendant State Farm's cross-complaint is reversed. The cause is remanded for proceedings consistent with this opinion.

Traynor, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment.

---

[17]The trial court may, in determining the reasonableness or lack of it on the part of State Farm, consider as evidence its alleged practice of delaying investigation until the presentation of a ''significant'' claim on the policy of insurance.