[L.A. No. 30636. July 20, 1978.]

SUN 'N SAND, INC., et al., Plaintiffs and Appellants, v.
UNITED CALIFORNIA BANK, Defendant and Respondent.

672

674

COUNSEL

George DeRoy and Hochman, Salkin & DeRoy for Plaintiffs and Appellants.

Gendel, Raskoff, Shapiro & Quittner and Richard S. Berger for Defendant and Respondent.

OPINION

MOSK, J.—We address here a variation on the recurring theme (see, e.g., *Cooper* v. *Union Bank* (1973) 9 Cal.3d 371 [107 Cal.Rptr. 1, 507 P.2d 609]) of the rights of an employer to recover funds embezzled by a faithless employee through the manipulation of company checks.

The appeal arises from a judgment (order of dismissal) entered after a general demurrer to plaintiffs' second amended complaint was sustained; prior to the ruling plaintiffs conceded they were unable to amend further.

The material facts alleged are as follows: Plaintiffs are sister corporations (hereinafter collectively referred to as Sun 'n Sand) having the same shareholders and doing business from the same premises. As a duty of her employment with Sun 'n Sand, Eloise Morales prepared checks for signature by a corporate officer. Over a three-year period she made nine of such checks payable to United California Bank (UCB), each for a different, small amount. She obtained authorized signatures on these checks from a Sun 'n Sand officer who believed they represented small sums his company owed to UCB. No such debts were in fact owed. Morales then altered the checks, increasing the amount in each case to several thousand dollars, and presented them to UCB. Although UCB was the named payee, it "caused or permitted" the proceeds of the checks to be deposited in a personal account maintained by Morales at UCB.

Sun 'n Sand had its company account with Union Bank. UCB presented each of these checks to Union Bank, which paid them and charged Sun 'n Sand's account for their face amounts. Morales concealed her actions by destroying some and manipulating other company

records;[1] as a result, Sun 'n Sand did not discover her fraudulent activity until June 23, 1973, some three months after the last altered check transaction.[2]

Sun 'n Sand instituted this action by filing its original complaint on March 4, 1974. Although the complaints named UCB and Union Bank as codefendants, the present appeal involves Sun 'n Sand's rights against UCB alone. The amended complaints sought to recover the total amount of the checks in question (fn. 2, *ante*) on six alternative theories: one each based on mistake, fraudulent misrepresentation, negligence, and warranty against material alteration, and two based on title warranties.

UCB demurred on the grounds (1) that each of the six counts fails to state facts sufficient to constitute a cause of action, and (2) that various statutes of limitation bar some or all of the causes of action alleged. The court sustained the demurrer on the grounds stated, "and in particular and in addition, because United California Bank, as payee, owed no duty to plaintiffs which was breached." The court ordered the case dismissed as against UCB, and Sun 'n Sand appealed. (Code Civ. Proc., § 581, subd. 3.)

I

In three of the counts it asserts, Sun 'n Sand relies on certain warranty obligations imposed by sections 3417 and 4207 of the California Uniform Commercial Code.[3] These are parallel provisions, as recognized in the

---

[1] Although it was not alleged in the complaint that Sun 'n Sand received any statements of account from Union Bank, the trial court judicially noticed that it is the custom of commercial banks to send each of its depositors a monthly statement together with cancelled checks drawn on the depositor's account. (Evid. Code, § 452, subds. (g), (h).)

[2] The nine altered checks were negotiated on the following dates and in the amounts indicated:

| | |
|---|---|
| February 6, 1970: | $ 5,767.85 |
| October 2, 1970: | 3,545.48 |
| January 13, 1971: | 4,143.53 |
| July 19, 1971: | 4,011.28 |
| December 2, 1971: | 2,952.00 |
| February 22, 1972: | 5,231.57 |
| May 10, 1972: | 3,585.65 |
| October 16, 1972: | 3,227.16 |
| March 15, 1973: | 2,293.41 |
| | $34,757.93 |

[3] Unless otherwise indicated, all statutory references are to the California Uniform Commercial Code.

California code comments that explain their effect on California law: "Section 4207 fixes the same warranties for the collection of items through the banking system that Commercial Code § 3417 establishes for the transfer of commercial paper not collected through the banking system." (§ 4207, com. 1; West's Cal. U. Com. Code. Ann. (1964 ed.) p. 577.)[4] ■ ■■■ Sun 'n Sand seeks to utilize both sections because of UCB's dual role in the events alleged herein: the complaint predicates liability under section 3417 on the bank's status as payee on the nine checks and under section 4207 on its activity as a collecting bank in the check collection process.[5]

A. *Sun 'n Sand's Right to Maintain an Action Based on the Warranties of Sections 3417 and 4207*

The first issue we confront is whether Sun 'n Sand, as the drawer of the checks in question, may rely on the warranty provisions it seeks to invoke.

Prior to the development of the UCC, courts split sharply over the right of a drawer to proceed directly against a collecting bank for losses resulting from the bank's negotiation of a check on a forged indorsement.[6] After noting the " 'hopeless conflict' in the authorities" in *Cal.*

---

[4]See also the official comments to the Uniform Commercial Code (UCC): "Subject to certain exceptions peculiar to the bank collection process and except that they apply only to customers and collecting banks, the warranties and engagements to honor in this section are identical in substance with those provided in the Article on Commercial Paper (Article 3)." (UCC, § 4-207, com. 1.)

The California Uniform Commercial Code sections referred to in this opinion are identical in all relevant respects to the UCC sections of the corresponding number; our references to "the Code" are intended to apply to both the California and the uniform codes.

[5]UCB claims that liability may not be based on section 4207 because it was not a collecting bank in the transactions alleged herein. Section 4105 defines a collecting bank as "any bank handling the item for collection except the payor bank." Official UCC comment 1 to that section explains that the definition "in general exclude[s] a bank to which an item is issued," but provides that such exclusion does not apply when "the item is issued to a payee for collection, as where a corporation is transferring balances from one account to another." The facts alleged herein, if true, establish that UCB treated the checks as though it was merely a nominal payee, named as such to facilitate collection. Thus, it may not successfully demur on the ground that it was not a collecting bank.

[6]See cases cited in O'Malley, *Common Check Frauds and the Uniform Commercial Code* (1969) 23 Rutgers L.Rev. 189, 212-213, footnotes 128 and 130. In pre-UCC cases the direct suit issue invariably arose in the forged indorsement context; the warranties of subdivisions (1)(a) of sections 3417 and 4207, as discussed below, are intended to deal with the problems of forged indorsements. The pre-UCC cases also involved drawers' rights against collecting banks. For convenience, in our discussion of the rights of a drawer we will focus on section 4207, which provides for the liability of collecting banks; our conclusions, as shall be apparent, extend as well to section 3417.

*Mill Supply Corp.* v. *Bank of America* (1950) 36 Cal.2d 334, 341 [223 P.2d 849], we held that the drawer had "no right of direct action against the collecting bank for its loss on checks bearing forged endorsements . . . ." Adoption of this view did not relieve collecting banks of ultimate liability, however; the drawer could proceed against the drawee bank for violation of its contractual obligation to pay monies out of the drawer's account only according to his order, and the drawee bank in turn had a remedy against the collecting bank based on the latter's implied warranty of the validity of the indorsement. Placing the loss on the collecting bank by means of this circuitous route was thought to be necessary because the conceptual basis for that bank's liability was an implied contractual warranty and no contractual relationship existed between it and the drawer. (*Id.,* at pp. 338-339.)

The rule of *California Mill Supply,* of course, sharply conflicts with the objective of avoiding multiple suits; we therefore reexamine that rule in light of section 4207, which shifts the basis for imposing liability on the collecting bank from an implied contractual warranty to an explicit statutory warranty. In determining whether the drawer of a check is among those to whom the statutory warranties of section 4207 were intended to be extended, we are guided by our observation in *Cooper* v. *Union Bank* (1973) *supra,* 9 Cal.3d 371, 381-382: "Requiring cumbersome and uneconomical circuity of action to achieve an identical result would obviously run contra the code's explicit underlying purposes 'to simplify, clarify and modernize the law governing commercial transactions.' (§ 1102, subd. (2)(a).)"

In *Allied Concord etc. Corp.* v. *Bank of America* (1969) 275 Cal.App.2d 1, 3-4 [80 Cal.Rptr. 622], the court determined that with the enactment of the California Uniform Commercial Code *California Mill Supply* was effectively overruled, as the Code authorizes direct suit by a drawer against both depositary and collecting banks. The court found support for its holding in principles of contract law relating to third party beneficiaries. While we agree that direct suit is authorized by the California Uniform Commercial Code, we find it unnecessary to rely on third party beneficiary principles in reaching this conclusion.

Section 4207, subdivision (1), provides that its warranties extend to "the payor bank or other payor who in good faith pays or accepts the item . . . ." To receive the benefit of these warranties, then, the drawer of a check must qualify as an "other payor who . . . pays." At least one court has held, although without offering any explanatory rationale, that a

drawer whose account was debited by his bank is a payor entitled to claim the benefit of these warranties. (*Insurance Company of No. Amer.* v. *Atlas Supply Co.* (1970) 121 Ga.App. 1 [172 S.E.2d 632, 636].) We find this broad construction of the payor concept justified by inferences that can be drawn from the structure of section 4207 and language in the official comments to the UCC.[7]

The warranties provided for in subdivisions (1)(b) and (1)(c) of section 4207 are expressly made subject to certain exceptions which operate in favor of a holder in due course who acts in good faith. These warranties are not extended to a number of parties, including a drawer "whether or not the drawer is also the drawee." (§ 4207, subds. (1)(b)(ii) and (1)(c)(ii).) By negative implication, the warranties are given by a collecting bank to a drawer who is not also the drawee (payor) bank—at least when the collecting bank is not a holder in due course or does not act in good faith. Section 4207 is quite clear in excepting drawers under subdivisions (1)(b)(ii) and (1)(c)(ii); accordingly, we may infer that drawers are among those to whom the warranty of section 4207, subdivision (1)(a), extends, as no comparable exceptions are there made.

The inferences thus compelled by the structure of section 4207 indicate the Code contemplates that the drawer of a check is an "other payor" for purposes of that section who may, unless specifically excepted, claim the benefits of the warranties therein created. Although the term "payor" is more commonly used in reference to the drawee than the drawer, it is not defined anywhere in the Code and hence should not be regarded as a term of art used in a narrow, technical sense; when a check is negotiated, it is the drawer who ultimately "pays" when his account is charged in the amount of the check. This is implicitly recognized in the official comments to the UCC: "Similarly, under subparagraph (ii) a drawer of a draft is presumed to know his own signature and if he fails to detect a forgery of his signature and *pays a draft* he may not recover that payment from a holder in due course acting in good faith." (Italics added.) (UCC, § 3-417, com. 4.)[8]

■ We therefore hold that the drawer of a check whose account is charged is a payor within the meaning of section 4207 and may maintain

---

[7]For a perceptive analysis of the UCC provisions bearing on the direct suit issue, see Comment, *Drawer v. Collecting Bank for Payment of Checks on Forged Indorsements—Direct Suit Under the Uniform Commercial Code* (1971) 45 Temp. L.Q. 102.

[8]The imprecise use of language throughout the Code is well demonstrated in Mellinkoff, *The Language of the Uniform Commercial Code* (1967) 77 Yale L.J. 185.

an action against a collecting bank based on that section's warranties. For the foregoing reasons, we further hold that the drawer of a check is "a person who in good faith pays" within the meaning of section 3417 and may maintain an action against the payee of a check based on the section 3417 warranties.[9]

Courts in other jurisdictions that have denied to drawers a direct right of action have apparently been concerned that collecting banks would not always be able to assert defenses available to drawee banks. They have assumed that direct suits by drawers would not merely avoid circuity of action, but would alter substantive rights. (See, e.g., *Stone & Webster Eng. Corp.* v. *First National B. & T. Co.* (1962) 345 Mass. 1 [184 N.E.2d 358, 362-363, 99 A.L.R.2d 628]; *Life Insurance Company of Virginia* v. *Snyder* (1976) 141 N.J.Super. 539 [358 A.2d 859, 862].) We find nothing to prevent collecting banks (and payees) from asserting the same defenses as drawee banks. ·

The most important defenses in this context are particularized in sections 3406 and 4406 of the Code. These provisions, discussed *infra,* would under certain circumstances preclude parties, including drawers, from asserting the alteration of an instrument or the making of an unauthorized signature.

Section 3406 operates in favor of a holder in due course or "a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." Once again we recognize that the term "payor" is not used in a technical sense; it must be read in light of the provision in which it appears and the structure of the Code as a whole. We have determined that the statutory warranties of sections 3417 and 4207 are given to the drawer of a check; those sections clearly contemplate that a drawer has a direct right of action, and this result is consonant with the Code's important underlying policy of simplifying and modernizing the law governing commercial transactions. Finding nothing in the Code to suggest that all defenses applicable in a suit by the drawer against the drawee bank are not likewise applicable in a direct suit against the collecting bank, we hold that a collecting bank is an "other payor" for purposes of section 3406.

---

[9]The language of subdivisions (1)(a), (1)(b), and (1)(c) of section 3417 are identical in all relevant respects to the corresponding subdivisions of section 4207, thus giving rise to the same negative implication that direct suit by a drawer is permitted.

The preclusions of section 4406 may also be invoked by the collecting bank in a direct suit by a drawer. Subdivision (5) of that section provides: "If under this section a payor bank has a valid defense against a claim of a customer upon or resulting from payment of an item and waives or fails upon request to assert the defense the bank may not assert against any collecting bank or other prior party presenting or transferring the item a claim based upon the unauthorized signature or alteration giving rise to the customer's claim." As the court recognized in *Allied Concord etc. Corp.* v. *Bank of America* (1969) *supra*, 275 Cal.App.2d 1, 6, this subdivision implies that section 4406 defenses, available to a drawee bank against claims of its depositors, are also available to a collecting bank in a direct action by the depositor.

■ Having concluded that Sun 'n Sand, as drawer of the checks in question, may rely on the warranty provisions of sections 3417 and 4207, we must determine whether it has alleged facts which, if established at trial, would constitute a breach of the warranties it asserts.

B. *The Good Title Warranties of Sections 3417 and 4207*

In its second and third causes of action, Sun 'n Sand seeks to recover for breach of the warranties of good title extended by subdivision (1)(a) of section 3417 and the functionally equivalent subdivision (1)(a) of section 4207.[10] We must therefore examine the good title concept of these provisions to determine the scope of UCB's warranty and whether Sun 'n Sand's allegations define a breach thereof.

■ The weight of authority among cases and commentators supports a specialized construction of the term "good title" as it is used in this context, limiting its reference to the validity of the chain of necessary indorsements. (See, e.g., Whaley, *Forged Indorsements and the UCC's "Holder"* (1972) 6 Ind.L.Rev. 45, 59-61; *Bagby* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (8th Cir. 1974) 491 F.2d 192, 199; *Aetna Life and Casualty Co.* v. *Hampton State Bank* (Tex.Civ.App. 1973) 497 S.W.2d 80,

---

[10]Section 3417 provides in relevant part: "(1) Any person who obtains payment or acceptance and any prior transferor warrants to a person who in good faith pays or accepts that

"(a) He has a good title to the instrument or is authorized to obtain payment or acceptance on behalf of one who has a good title; . . ."

Section 4207 provides in relevant part: "(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that

"(a) He has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; . . ."

84-85; *Federal Insurance Co.* v. *Groveland State Bank* (1975) 37 N.Y.2d 252 [372 N.Y.S.2d 18, 333 N.E.2d 334, 338].) This limitation of the scope of the good title warranty is derived from the official comments to the UCC, the content given the good title concept under the Uniform Negotiable Instruments Law (NIL) (the pre-UCC body of law governing negotiable instruments), and the structure of Code provisions distributing losses caused by forgeries and dishonest employees.

Although the Code fails to define "good title," the warranty provision is described as follows: "Subsection (1)(a) retains the generally accepted rule that the party who accepts or pays does not 'admit' the genuineness of indorsements, and may recover from the person presenting the instrument when they turn out to be forged." (UCC, § 3-417, com. 3.)[11] The California code comments further explain: "Subdivision (1)(a) continues the rule of former Civil Code § 3146(2).[12] The effect of this subdivision is to permit the drawee to recover payment from a holder in due course when that payment is made upon a forged indorsement." (§ 3417, com. 3; West's Cal. U. Com. Code Ann. (1964 ed.) p. 380.) The purpose of the rule embodied in the good title warranty is "to speed up the collection and transfer of checks and to take the burden off each bank to meticulously check the endorsements of each item transferred." (*Federal Deposit Insurance Corp.* v. *Marine National Bank* (M.D.Fla. 1969) 303 F.Supp. 401, 403.) As the court recognized in *Feldman Constr. Co.* v. *Union Bank* (1972) 28 Cal.App.3d 731, 736 [104 Cal.Rptr. 912], "The theory is that the first bank in the chain has a duty to make certain all endorsements are valid; banks subsequently taking the paper have a right to rely on the forwarding bank." (See also *Maddox* v. *First Westroads Bank* (1977) 199 Neb. 81 [256 N.W.2d 647, 653]; Clarke, Bailey & Young, Bank Deposits and Collections (4th ed. 1972) p. 130.)

Implicit in the above-quoted language from the code comments and case law is that the warranty of good title relates only to the validity of necessary indorsements. This implication is reinforced by an examination of three situations that have not been deemed within the warranty either under the NIL or the UCC: (1) stolen bearer paper, (2) forgery of the drawer's signature, and (3) fictitious payees.

---

[11]Official UCC comment 1 to section 4-207 provides that the warranties of sections 4207 and 3417 are substantially identical (fn. 4, *ante*), and refers to the comments to section 3417 for an explanation of the purposes of the warranties.

[12]Former Civil Code section 3146 was identical to section 65 of the NIL.

It is settled that "title to bearer paper passes with the instrument even through the hands of a thief." (Whaley, *Forged Indorsements and the UCC's "Holder"* (1972) 6 Ind.L.Rev. 45, 61; see also White, *Some Petty Complaints About Article Three* (1967) 65 Mich.L.Rev. 1315, 1330.) Subdivisions (2)(a) of sections 3417 and 4207 reflect this limitation on the title concept in that they supplement the title warranty with a warranty that "the transfer is otherwise rightful." The official UCC comments explain: "The liabilities imposed by subsection (2) in favor of the immediate transferee apply to all persons who transfer an instrument for consideration whether or not the transfer is accompanied by indorsement." (UCC, § 3-417, com. 7.) The implication, of course, is that subdivisions (1)(a) of these sections—containing only a naked title warranty—do not impose liability when a transfer does not require an indorsement, as in the case of bearer paper. The warranty of good title thus is not a warranty of valid delivery, i.e., nontheft.

Neither does the good title warranty apply when it is the drawer's signature that is forged. Subdivisions (1)(b) of sections 3417 and 4207 set forth a separate, limited warranty to deal with such forgeries. Official UCC comments 3 and 4 and California code comments 3 and 4 to section 3417 compare the warranties of subdivisions (1)(a) and (1)(b) by discussing the rationale for distinguishing between the forgery of an indorser's signature and the forgery of a drawer's signature. Again, the implication is quite clear: the title concept of subdivision (1)(a) is concerned only with the validity of indorsements.

Analysis of section 3405 suggests a further limitation on the title concept—and one which has particular relevance herein—in the case of "no interest" or "fictitious" payees. The section provides that an indorsement by anyone in the name of a named payee is effective under certain circumstances, including when an employee of the drawer supplies him with the payee's name intending the named payee to have no interest in the instrument.[13] The official UCC comments make clear that the provision is intended to place the risk of loss from this type of dishonest employee behavior on the employer/drawer: "The principle followed is that the loss should fall upon the employer as a risk of his

---

[13]Section 3405 provides in relevant part: "(1) An indorsement by any person in the name of a named payee is effective if

". . . . . . . . . . . . . . . . . . . .

"(c) An agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest."

business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee." (UCC, § 3-405, com. 4.)

The loss allocation intended by section 3405 is effectuated only if that section makes indorsements effective for purposes of the good title warranty, and if the warranty is as a result not breached. The drafters of section 3405 thus obviously contemplated that the good title warranty is concerned only with the validity of indorsements, and that if indorsements are deemed effective, the dishonest employee behavior with which section 3405 is concerned must not constitute a breach of that warranty. Yet this is precisely the behavior upon which Sun 'n Sand would found liability. Sun 'n Sand alleges in essence that a dishonest employee has supplied a corporate officer authorized to issue checks with the name of a payee, UCB, intending the payee to have no interest in the checks issued. This is functionally indistinguishable from the fact pattern set forth in official UCC comment 4b to section 3-405 as illustrating when subdivision (1)(c) operates to place losses on the drawer.[14]

The foregoing analysis establishes, and we hold, that the warranty of good title of sections 3417 and 4207 involves a very limited inquiry: does the instrument presented contain all necessary indorsements and are such indorsements genuine or otherwise deemed effective? Because Sun 'n Sand does not allege facts that would constitute a breach of this warranty, its second and third counts fail to state a cause of action.

C. *The Warranty Against Material Alteration of Sections 3417 and 4207*

■ In its sixth cause of action Sun 'n Sand seeks to invoke the warranty against material alteration which subdivisions (1)(c) of sections 3417 and 4207 prescribe, alleging that each of the checks in issue was written originally in "a relatively small amount," but was raised by the

---

[14]Subdivision (1)(c) of section 3405 obviously assumes that the employee supplying the payee's name will cash the check on a forged indorsement and that the named payee, if a real person, will never be aware of the check's existence. When the named payee is a bank through which the check is channeled, the negotiation of the check by the bank under such circumstances is improper and the loss allocation analysis of the comments to section 3405 is not apt in a negligence action based on the manner of negotiation. The indorsement is still effective for purposes of the good title warranty, however.

employee whose perfidy made possible this litigation and ultimately was charged against its account with Union Bank in the raised amount.

The raising of a check is clearly a material alteration (§ 3407, subd. (1)), but the warranty provisions on which Sun 'n Sand would rely are subject to a number of exceptions that operate in favor of a holder in due course who acts in good faith. One so qualifying does not warrant the lack of material alteration to, among others, the drawer of a check. We must determine, therefore, whether Sun 'n Sand's allegations pose any factual issues as to UCB's status as a good faith holder in due course.[15]

Section 3302, subdivision (1), provides that a holder qualifies as a holder in due course if he takes a negotiable instrument (1) in good faith, (2) for value, and (3) without notice of any defense against or claim to it that any person might have. No issues are presented by Sun 'n Sand as to UCB's status as a holder or its good faith in taking the check or in acting to obtain payment on it from the drawee bank. The "for value" requirement also appears to be satisfied, although this is not entirely clear.

Section 3303 sets forth the generally applicable rules concerning "taking for value," and section 4209 supplements these rules by providing that a bank gives value for purposes of determining its status as a holder in due course "to the extent that it has a security interest in an item . . . ." Section 4208, subdivision (1), makes clear that a bank has a security interest—and therefore has given value in the holder in due course sense—to the extent that a depositor has withdrawn money credited to his account. Sun 'n Sand, however, alleges only that the checks in issue were deposited to the account of its embezzling employee;

---

[15]Section 3417 provides in relevant part: "(1) Any person who obtains payment or acceptance and any prior transferor warrants to a person who in good faith pays or accepts that

" . . . . . . . . . . . . . . . . .

"(c) The instrument has not been materially altered, except that this warranty is not given by a holder in due course acting in good faith

" . . . . . . . . . . . . . . . . .

"(ii) To the drawer of a draft whether or not the drawer is also the drawee; . . ."

Section 4207 provides in relevant part: "(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that

" . . . . . . . . . . . . . . . . .

"(c) The item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith

" . . . . . . . . . . . . . . . . .

"(ii) To the drawer of a draft whether or not the drawer is also the drawee; . . ."

the complaint is silent on whether any of the money so credited has been withdrawn. In the unlikely event that some of the funds remain in the account, we consider briefly the circumstances under which a bank may be deemed to have fulfilled the "for value" requirement even though credited funds have not been withdrawn.

Subdivision (1)(b) of section 4208 provides that value is deemed given once credit is "available for withdrawal as of right, to the extent of the credit given whether or not the credit is drawn upon and whether or not there is a right of chargeback." Section 4213, subdivision (4)(a), informs us that credit given by a bank becomes available for withdrawal as of right when the bank receives final settlement and has had a reasonable time to learn that settlement is final. This is logical, for at that time the bank's right to revoke its provisional settlement with its customer terminates (§ 4212, subd. (1)); it is committed to giving credit to its customer and may no longer protect itself by merely debiting his account. (See generally White & Summers, Handbook of the Law Under the Uniform Commercial Code (1972) pp. 467-468.) Thus, it has given value and may be a holder in due course if the other requisites of such status are satisfied.

Since it is not clear from Sun 'n Sand's allegations that the money credited to its employee's account has been withdrawn or that final payment, defined in section 4213, subdivision (1), has occurred, we cannot ascertain if UCB has met the test for "giving value." We need not so determine, however, because Sun 'n Sand has alleged facts that create serious doubt as to whether UCB is sufficiently "without notice" to qualify as a holder in due course.

The term "notice" is defined generally in section 1201, subdivision (25); most relevant herein is subdivision (25)(c), which provides that one has notice of a fact when "from all the facts and circumstances known to him at the time in question he has reason to know that it exists." What constitutes "reason to know" in the context of the holder in due course doctrine is elucidated in section 3304, two provisions of which are implicated by the facts alleged. Subdivision (1)(a) provides in relevant part that a purchaser has notice of a claim or defense if an instrument is ". . . so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay." ▮ Although this subdivision focuses on irregularities appearing on the face of an instrument, we may infer that notice is imparted by other irregularities, such as in the manner of negotiation of an instrument, which create

ambiguities as to the party entitled to be paid. Subdivision (2) further provides that "The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty."

Sun 'n Sand alleges that the checks at issue were drawn to the order of UCB as payee but were nonetheless negotiated by a Sun 'n Sand employee (fiduciary) for her own benefit. These facts suggest an irregularity in the negotiation of the checks which at the very least creates an ambiguity as to the proper disbursement of the funds represented by the checks; indeed, the facts present the situation described in subdivision (2), which seems to contemplate that notice derives not from a mere ambiguity as to the person to be paid, but from affirmative indications that an improper party is attempting to procure payment. (See *Dayton, Price & Co., Ltd.* v. *First National City Bank* (N.Y. County Ct. 1977) 22 U.C.C. Rep.Serv. 454, 457.)[16]

We conclude therefore that Sun 'n Sand's allegations, if true, establish adequate notice so as to preclude UCB from holder in due course status; accordingly, the demurrer cannot be sustained on the ground that UCB must be excepted from the material alteration warranty as a holder in due course acting in good faith. Of course UCB will have an opportunity at trial to show that it lacked the requisite notice by proving special circumstances justifying it in crediting the employee's account without making further inquiry.[17]

The cause of action for breach of the warranty against material alteration is limited, however, in certain respects. Under this theory, Sun 'n Sand challenges the negotiation of the checks *in the raised amounts;* it does not assert that the checks should not have been negotiated according to their original tenor. ■ ■■■ The wrong for which it seeks to recover under this cause of action is negotiation by UCB in an excessive amount, and the proper measure of recovery therefor is the difference

---

[16]The duty of a bank presented with a check drawn to its order is more fully discussed in the analysis of Sun 'n Sand's negligence cause of action in Part II of this opinion.

[17]See, e.g., *Transamer. Ins. Co.* v. *United States Nat'l Bank* (1976) 276 Ore. 945 [558 P.2d 328, 337], in which the court stated: "There was substantial evidence that plaintiff made a practice of drawing checks payable to the bank and of sending them to the bank for deposit into the accounts of its customers according to instructions either on the face of the check or on an accompanying deposit slip. This evidence was sufficient to raise a jury question whether, in light of this practice, the bank's handling of the checks delivered to it for deposit to the [accounts of the third parties] . . . was reasonable."

between the raised amount and the amount for which the checks were originally drawn.[18]

██ More serious in consequence is UCB's claim that Sun 'n Sand is precluded from asserting alteration of the checks by the provisions of section 4406. Subdivision (1) of that section imposes a duty on bank customers to exercise reasonable care and promptness to examine their bank statements, discover alterations, and notify the bank of such discovery; subdivision (2) provides for certain preclusions if the bank establishes the customer's failure to comply with the duty so imposed. We decide below that Sun 'n Sand's allegations necessarily establish such a failure to comply; nonetheless, UCB's demurrer may not be sustained on the basis of the subdivision (2) preclusions because subdivision (3) provides they are inapplicable "if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)." ██ ██ ██ As we discuss in Part II of this opinion, Sun 'n Sand has alleged facts that at least put in issue whether UCB has met this standard of care.[19]

██ Subdivision (4), however, sets forth a further preclusion that UCB may effectively invoke: "Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer

---

[18]See section 4401, subdivision (2)(a), which provides that a drawee bank which has acted in good faith may charge the account of its customer/drawer according to the original tenor of the altered item. Consequently, in an action against the collecting bank on its warranty, the drawee bank would be limited to recovering the amount by which the check was raised. (Brady on Bank Checks (4th ed. Bailey 1969) pp. 441-442.)

[19]We are aware, of course, that section 4406 is primarily concerned with the relationship between the drawer and the drawee—not the collecting—bank. As discussed in Part I-A of this opinion; however, the Code authorizes direct suit by the drawer against the collecting bank, and subdivision (5) of section 4406 implies that a collecting bank may invoke that section's preclusions. We further conclude that subdivision (3) is concerned with the lack of ordinary care of *the bank against whom action is brought.* This means, of course, that when the drawee bank is not negligent and the collecting bank is (or vice versa), direct suit may yield a different conclusion than would multiple actions. This result is conceptually sound, however, and best accords with the purpose of subdivision (3) of adjusting for the balance of equity between the customer and the bank from which recovery is sought. The subdivision very clearly reflects a determination that a bank should not be shielded from warranty liability by the customer's lack of care when it is also charged with lack of care. Thus, it is entirely appropriate that the customer should be relieved of the subdivision (2) preclusion when proceeding against a negligent collecting bank, even though the preclusion would have applied had he sought recovery from a nonnegligent drawee bank. We need not compel a loss allocation less consistent with the purpose of subdivisions (2) and (3) merely because section 4406 was drafted with little attention to the support for allowing direct actions evident in other provisions and, more importantly, in the underlying policy of the Code.

(subdivision (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or any unauthorized indorsement . . . is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration."

Each of the first eight checks was alleged to have been issued sufficiently in advance of the filing of this action to compel the inference that it was negotiated and made available to Sun 'n Sand with an accompanying monthly statement prior to the one-year time limit of section 4406, subdivision (4); accordingly, Sun 'n Sand is barred from asserting its alteration count as to these eight checks. The ninth check was alleged to have been negotiated within one year of this action; we must therefore determine whether in the case of a series of altered checks a new one-year period begins to run with each successive check, or whether the preclusion extends to all checks—even those negotiated less than one year before suit is commenced—once the time bar precludes action on the first.

The preclusions of subdivision (2) are set forth in two separate clauses: subdivision (2)(a) deals with unauthorized signatures and alterations on single items and subdivision (2)(b) states a different rule specifically applicable to repetitive forgeries or alterations. Subdivision (4), by contrast, declares only one rule using terms that suggest later items in a series are to be treated no differently from the first item or single items. This failure to explicitly differentiate between one-time and repetitive forgeries and alterations in subdivision (4) leads us, in light of the express distinction in subdivision (2), to conclude that a new one-year period begins to run with each successive check. (Accord, *Neo-Tech Systems, Inc.* v. *Provident Bank* (1974) 43 Ohio Misc. 31, 34-37 [72 Ohio Ops.2d 320, 335 N.E.2d 395], 17 U.C.C. Rep.Serv. 1079, 1082-1084; *Hardex-Steubenville Corp.* v. *Western Pa. Nat. Bank* (1971) 446 Pa. 446 [285 A.2d 874, 880].) Sun 'n Sand is thus not precluded by subdivision (4) from asserting its alteration count with respect to the ninth (most recent) check alleged to have been negotiated.

## II

■ Sun 'n Sand proceeds in its fifth cause of action on a theory of negligence, asserting that UCB breached its duty of care in permitting checks on which the bank was named as payee to be deposited in the personal account of Sun 'n Sand's employee. UCB challenges the sufficiency of this count in a number of respects.

UCB's principal contention is that it had no duty to investigate or make any inquiries under the facts alleged. It first argues that its failure to inquire was nonfeasance rather than misfeasance, and therefore it was not responsible for the acts of a third person—the dishonest conduct of Sun 'n Sand's employee—absent a special relationship with the injured party.

We need not consider whether a special relationship exists between a collecting bank and the drawer of a check, because UCB's "nonfeasance" characterization does not withstand analysis. It is UCB's *conduct* in crediting the embezzler's account with checks drawn payable to UCB that forms the basis for relief herein. Sun 'n Sand contends these circumstances created sufficient doubt as to the authority of its employee to negotiate the checks for her own benefit that UCB should not have acted without making inquiries to confirm the employee's authority. Such inquiries, it asserts, would have revealed the fraud being perpetrated and prevented Sun 'n Sand's loss. The asserted wrong, therefore, is not that UCB failed to intervene beneficially (nonfeasance) but rather that it affirmatively engaged in risk-creating conduct (misfeasance). (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36].) We must decide, however, whether the circumstances alleged were sufficiently suspicious, and the risks thus sufficiently apparent, that a duty to make reasonable inquiries arose.

UCB's claim that the facts alleged are "facially innocuous" conflicts with the weight of authority in this and in other jurisdictions. In *Pacific Finance Corp.* v. *Bank of Yolo* (1932) 215 Cal. 357 [10 P.2d 68], we held the defendant bank liable for crediting the personal account of the plaintiff's agent with proceeds from drafts drawn payable to the bank. We cited *Sims* v. *United States Trust Co.* (1886) 103 N.Y. 472 [9 N.E. 605, 606], a case we described as "similar in fact and identical in principle," and quoted therefrom this language: "The use of the defendant's name as payee of the check indicated the drawer's intention to lodge the moneys in its custody and place them under its control, and nothing further than this was inferable from the language of the check." (215 Cal. at pp. 360-361.) *Bank of Yolo* makes clear that a payee bank may not negotiate checks in favor of an unauthorized agent and that "Mere possession of the instrument by the agent is not a sufficient representation to create apparent authority. His possession dispels none of the ambiguity engendered by the drawing of the check. Therefore, the bank is not justified in relying on the agent's misrepresentation of the drawer's

purpose." (Comment, *Checks Payable to the Order of a Bank* (1951) 3 Stan.L.Rev. 330, 332.)

The principle of *Bank of Yolo* was reaffirmed in *Pacific Indemnity Co. v. Security First Nat. Bank* (1967) 248 Cal.App.2d 75 [56 Cal.Rptr. 142], a case involving facts similar to those alleged herein. The opinion of the court quotes with approval what it terms a well-established rule: " 'Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment.' (9 C.J.S., Banks and Banking, § 340, p. 683.)" (248 Cal.App.2d at p. 94.) The court held the defendant bank negligent in failing to inquire of the dishonest agent therein concerning his authority to divert to his personal account the proceeds of checks drawn payable to the bank.[20]

Courts in other jurisdictions have similarly concluded that a bank presented with checks payable to itself by one who proposes to deposit such checks in his personal account " 'is put upon inquiry and if it fail to make it, pays at its peril.' " (*Federal Savings & Loan Ins. Corp. v. Kearney Trust Co.* (8th Cir. 1945) 151 F.2d 720, 725-726, quoting with approval from *Havana Cent. R. Co. v. Central Trust Co. of New York* (2d Cir. 1913) 204 F. 546, 551; see *Transamer. Ins. Co. v. United States Nat'l Bank* (1976) *supra,* 558 P.2d 328, 333; *Wright v. Mechanics Bank of St. Joseph* (Mo.App. 1971) 466 S.W.2d 174, 176-177; *Arrow Builders Supply Corp. v. Royal National Bank* (1968) 21 N.Y.2d 428 [288 N.Y.S.2d 609, 235 N.E.2d 756, 757-758]; *Guaranty B. & T. Co. of Alexandria v. C & R Develop. Co.* (1972) 260 La. 1176 [258 So.2d 543, 547-548]; *Robbins v. Passaic Nat. Bank & Trust Co.* (1932) 109 N.J.L. 250 [160 A. 418, 419]; see also Whaley, *Negligence and Negotiable Instruments* (1974) 53 N.C.L.Rev. 1, 15-17.)

We agree that an attempt by a third party to divert the proceeds of a check drawn payable to the order of a bank to the benefit of one other than the drawer or drawee suggests a possible misappropriation. Accordingly, we conclude that Sun 'n Sand's allegations define circumstances sufficiently suspicious that UCB should have been alerted to the risk that

---

[20]Three opinions were filed in *Pacific Indemnity:* an opinion of the court, a concurring opinion, and a dissenting opinion. Because the concurring opinion (*id.,* at p. 102) expressly endorses the principle of imposing liability on the payee bank set forth in the opinion of the court, we view the enunciation of this principle as representing the holding of the case and not merely the personal opinion of the justice who wrote the opinion of the court. (See *Mix v. Ingersoll Candy Co.* (1936) 6 Cal.2d 674, 679 [59 P.2d 144].)

Sun 'n Sand's employee was perpetrating a fraud. By making reasonable inquiries, UCB could have discovered the fraudulent scheme and prevented its success.

 UCB claims that, notwithstanding such a rational conclusion, a duty of inquiry would be excessively burdensome and therefore should not be imposed. We have often recognized that the imposition of a duty to exercise reasonable care in given circumstances depends on the balancing of a number of policy considerations. (See *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 342 [134 Cal.Rptr. 375, 556 P.2d 737], and cases cited therein.) The most important of these were set forth in *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], and include ". . . the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." Thus, the burden on banks that would result if we recognize a duty of inquiry in the circumstances defined by the allegations herein is a relevant consideration.

It is settled, however, that "the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk . . . ." (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 740 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; see also *Weirum* v. *RKO General, Inc.* (1975) *supra,* 15 Cal.3d 40, 46; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434-435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Our conclusion that UCB should have appreciated the indicia of misappropriation is, of course, nothing other than a determination that Sun 'n Sand's loss was reasonably foreseeable. We are not persuaded that commerce will be so impeded by a duty of inquiry in this context that we should depart from the fundamental principle that actors are liable for reasonably foreseeable losses occasioned by their conduct. The duty is narrowly circumscribed: it is activated only when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit. Moreover, the bank's obligation is minimal. We hold simply that the bank may not ignore the danger signals inherent in such an attempted negotiation. There must be

objective indicia from which the bank could reasonably conclude that the party presenting the check is authorized to transact in the manner proposed. In the absence of such indicia the bank pays at its peril.

UCB raises other defenses which would partially or completely preclude Sun 'n Sand from asserting breach of the duty recognized herein as a basis for recovery. It suggests that the Code does not permit Sun 'n Sand to proceed by means of a common law action for negligence. Section 1103 declares that the Code is supplemented by "the principles of law and equity," but only if such principles are not "displaced by the particular provisions" of the Code. UCB apparently reasons that section 3405 (fn. 13, *ante*) articulates a loss distributive scheme that applies to fact patterns such as alleged herein and therefore displaces common law negligence actions.

As we noted in discussing the good title warranties, the California and official UCC comments to section 3-405 contemplate that losses resulting from certain fraudulent employee behavior—i.e., causing the issuance of checks to payees intended to have no interest therein—should be risks of the employer's business and not of the banking community. This conclusion derives from the premise that the employer/drawer is better able to prevent the success of such frauds than the bank; the former may exercise care in selecting and supervising its employees, while the latter is typically presented with checks bearing indorsements forged in a manner that may be difficult if not practically impossible to detect. The comments assume, however, that such checks will never be delivered to the named payees, whether or not such payees are real persons or entities. We perceive this supposition to be critical to the loss allocative function of section 3405. While it may be less difficult for the employer to prevent the issuance of such checks than for the bank to detect that an indorsement is forged, this is not the relevant comparison when the bank is presented with checks naming it as payee. In the latter circumstance the bank is confronted with an obvious irregularity when the drawer's dishonest employee attempts to negotiate such checks for his own benefit. The bank does not have to be especially vigilant; its agent need only read what appears on the face of the check to be warned that a fraud may be in progress. It is clear therefore that the balance struck under section 3405 has no application in the present context and does not bar Sun 'n Sand from pursuing its remedies in tort.

UCB also asserts that as a holder in due course it took the checks free from Sun 'n Sand's common law cause of action for negligence. We have

already disposed of UCB's claim that under the facts alleged it must qualify as a holder in due course; Sun 'n Sand's allegations require us to conclude, rather, that UCB was not a holder in due course because it took with "notice," as shown by our analysis of section 3304 (Part I-C, *ante*) which focuses the concept of notice in the holder in due course context.[21]

UCB asserts and Sun 'n Sand concedes that the three-year statute of limitations of Code of Civil Procedure section 338, subdivision 3, bars recovery on a negligence theory for the first three checks alleged to have been issued. (Fn. 2, *ante*.) UCB further asserts, however, that the amount Sun 'n Sand can recover on checks four through eight is limited to the "relatively small amounts" for which these checks were originally written, before each was raised. UCB reasons that these checks were issued sufficiently prior to the commencement of this action that we may presume each of them was negotiated and returned to Sun 'n Sand with a monthly statement of account more than one year before such commencement; thus, the one-year time bar of section 4406, subdivision (4),

---

[21]Because we rely on specific provisions of section 3304 to find notice in the circumstances defined herein, we need not decide the extent to which facts constituting breach of duty (negligence) also constitute notice for purposes of the holder in due course doctrine. Most courts hold that "mere suspicious circumstances" do not impart notice; negligence in these jurisdictions must be so gross as to amount to bad faith before notice will be found. This restrictive view of the notice concept has led some courts to protect the defendant payee in circumstances substantially similar to those alleged herein. (See, e.g., *Eldon's Sup. Fresh Stores, Inc.* v. *Merrill Lynch, etc.* (1973) 296 Minn. 130 [207 N.W.2d 282]; *Richardson Company* v. *First Nat. Bank in Dallas* (Tex.Civ.App. 1974) 504 S.W.2d 812.)

We find such a position to be entirely unjustified in light of the provisions of section 3304, which clearly apply when a defendant payee permits itself to be used as the conduit through which a fraud is successfully perpetrated. More fundamentally, the restrictive view of notice on which the position of these courts is based appears unsound in light of the general definition of the term "notice" in section 1201, subdivision (25), and the manner in which the concept is used in the holder in due course doctrine. The definitional subdivision provides in relevant part that one has notice of a fact when from "all the facts and circumstances known to him at the time in question he has *reason to know* that it exists." (Italics added.) The phrase "reason to know," though undefined, suggests an objective notion of notice. Such a construction is reinforced by the structure of section 3302, subdivision (1), which enumerates the elements of holder in due course status and includes good faith and lack of notice as separate and distinct requirements. The foregoing provisions have led some courts and commentators to conclude that notice of the reason-to-know variety depends on what is commercially reasonable. (See, e.g., *Von Gohren* v. *Pacific National Bank of Washington* (1973) 8 Wn.App. 245 [505 P.2d 467, 472]; *Kaw Valley State Bank and Trust Company* v. *Riddle* (1976) 219 Kan. 550 [549 P.2d 927, 933]; *Winter & Hirsch, Inc.* v. *Passarelli* (1970) 122 Ill.App.2d 372 [259 N.E.2d 312, 317]; 2 Bender's U.C.C. Serv., Hart & Willier, Commercial Paper (1976) § 11.05[2].)

Since we need not decide this question now, however, we merely observe that the facts which impart notice herein (as specifically mandated by subds. (1)(a) and (2) of § 3304) are precisely those facts which form the basis of UCB's breach of duty: its negligence derives from its failure to respond reasonably to the "notice" conveyed by such suspicious circumstances.

precludes Sun 'n Sand from asserting that these checks were altered. UCB argues that the bar is absolute and expressly applies "Without regard to care or lack of care of either the customer or the bank"; were Sun 'n Sand permitted to recover the full amount at which each of these checks was negotiated, it would in effect be permitted to assert and recover for the raising of the checks, contrary to the terms of section 4406, subdivision (4). Although superficially appealing, this argument is premised on a misunderstanding of subdivision (4) and the intended function of its preclusion.

The one-year time bar of subdivision (4) is consistent with the previously enacted one-year statute of limitations prescribed in Code of Civil Procedure section 340, subdivision 3, for an action "by a depositor against a bank for the payment of a forged or raised check, or a check that bears a forged or unauthorized endorsement . . . ." This statute of limitations, however, applies only to actions seeking to establish *warranty* liability—whether the basis for such liability be an implied contractual warranty or, under the California Uniform Commercial Code, a statutory warranty. Because liability in a warranty action is virtually absolute, the Legislature's decision to cut short the otherwise applicable time limitations period—either three years in the case of statutorily created liabilities (Code Civ. Proc., § 338, subd. 1) or four years where the theory of the action is an *implied contractual warranty* (Code Civ. Proc., § 337, subd. 1)—reflects a reasonable policy choice. The bank depositor can shift losses occasioned by another's fraud free from the defenses that attend other bases of liability (e.g., negligence), but only if he is more diligent in pursuing his remedy.

Very different considerations are implicated, however, when an action is prosecuted on a theory of negligence. Our strong policy favors fault-based liability; negligent tortfeasors must compensate persons injured by their failure to exercise ordinary care. (Civ. Code, § 1714; *Rowland* v. *Christian* (1968) *supra,* 69 Cal.2d 108, 112.) The rules governing negligence actions—including the normally applicable three-year statute of limitations of Code of Civil Procedure section 338, subdivision 3[22]—should not be varied so as to diminish fault-based liability absent a clear and specific legislative directive. Finding no such directive in section 340, subdivision 3, of the Code of Civil Procedure, we conclude it is not intended to apply to actions for negligence.

---

[22]The three-year statute of limitations applies to recovery for injury to property; for different reasons of policy, the limitations period for negligence actions based on personal injuries is one year. (Code Civ. Proc., § 340, subd. 3.)

For the same reasons of policy we further conclude that subdivision (4) of section 4406 applies only to actions based on warranties set forth in the California Uniform Commercial Code. UCB argues that the intention to apply the one-year time bar of subdivision (4) to negligence actions is manifested in the language, "Without regard to care or lack of care of either the customer or the bank," which introduces that subdivision. In focusing narrowly on these words, however, UCB ignores the pattern of section 4406 as a whole; examination of the other subdivisions of the section reveals an explanation for the inclusion of the above-quoted language quite consistent with a legislative intent to limit the time bar of subdivision (4) to warranty actions.

Section 4406 creates a system of preclusions and exemptions therefrom which depends entirely on patterns of fault distribution between customer and bank. Subdivision (1) declares that the customer has a duty to exercise reasonable care and promptness in examining his bank statements and discovering alterations or forgeries of his own signature; subdivision (2) provides that the customer is precluded from asserting such alterations or forgeries if he fails to exercise the requisite care; and subdivision (3) relieves the customer of the subdivision (2) preclusion when he can establish that the bank has also failed to exercise ordinary care. Each of these first three subdivisions deals exclusively with the requirement of exercising care and the consequences of failing to do so. The introductory language of subdivision (4) thus relates back to the concern evinced in the preceding subdivisions with the care or lack of care of customer and bank. The language makes clear that subdivision (4), unlike those preceding it, decrees a rule the application of which is not conditioned on a particular distribution of fault. This is not to say that the rule recited therein is applicable without regard to the form of action pursued, however. We think it clear that the rules set forth in section 4406 are not intended to apply to negligence actions.

The elaborate structure of section 4406 discloses a concern that considerations of fault should be reflected in the allocation of losses between banks and their customers from the fraudulent manipulation of checks; but such considerations are inherently determinative of the loss allocation when an action proceeds on a theory of negligence. The bank is liable only if it is negligent, and the extent of its liability is diminished according to the customer's share of fault. (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].) Precluding a negligent customer from asserting a warranty action against a bank is rational because the customer's lack of care would not otherwise

be a defense and he would not be held to account for his negligence. The preclusion is inappropriate in a negligence action, however, where liability is determined by the extent of the parties' negligence. We perceive, therefore, a limited purpose in the provisions of section 4406—to factor the negligence of customer and bank into warranty actions for forged or raised checks.

In light of the policy disfavoring the diminution of fault-based liability absent a clear and express legislative intent, the language introducing subdivision (4) does not suffice to displace the three-year statute of limitations ordinarily applicable. The spirit of section 4406 as a whole and California law generally require us to conclude, rather, that subdivision (4), while it precludes a customer from asserting alterations *qua alterations* by means of a warranty action under the Code, has no application in a negligence action based on an independent wrong—e.g., failure to detect an irregularity in negotiation—in which there was also an alteration.

### III

In its first cause of action, Sun 'n Sand would base liability on a theory of mistake of fact: it alleges that it issued the checks in the mistaken belief that it owed UCB the amounts for which the checks were drawn. Section 1577 of the Civil Code, however, defines a "mistake of fact" as a mistake "not caused by the neglect of a legal duty on the part of the person making the mistake." As might be expected, UCB asserts this qualification as a bar to the first count, claiming that Sun 'n Sand's mistake was caused by its neglect of legal duties imposed by section 4406, subdivision (1), and section 3405.

■ UCB correctly observes that section 4406, subdivision (1), imposes a duty on bank customers to examine their bank statements and returned checks for alterations and forgeries. It does not follow, however, that breach of this duty by failure to exercise reasonable care in discharging it constitutes the "neglect of a legal duty" such that a cause of action for mistake of fact must be barred. In *National Bank of California v. Miner* (1914) 167 Cal. 532, 537 [140 P. 27], we set forth the standard of liability for mistake: " 'It is now settled . . . that money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund.' " We have since recognized on a number

of occasions that "ordinary negligence does not constitute the neglect of a legal duty as that term is used in section 1577 of the Civil Code." (*Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588, 595 [297 P.2d 644]; see also *Elsinore Union etc. Sch. Dist.* v. *Kastorff* (1960) 54 Cal.2d 380, 386-388 [6 Cal.Rptr. 1, 353 P.2d 713]; *M. F. Kemper Const. Co.* v. *City of L. A.* (1951) 37 Cal.2d 696, 702 [235 P.2d 7].) The rule developed in these cases reflects a determination that the "neglect of a legal duty" qualification derives content from equitable considerations and principles, and that it would be inequitable to bar relief for mistake because of the breach of a duty of care when the party from whom recovery is sought suffers no loss. That Sun 'n Sand may have failed to exercise care in examining its bank statements is thus not a sufficient basis for denying it equitable relief for mistake.

We need not decide whether section 3405 imposes a duty to supervise employees in the preparation of checks, as UCB contends; for the reasons stated relief for mistake of fact would not be barred even assuming such a duty and Sun 'n Sand's failure to exercise reasonable care in discharging it. The change of position requirement articulated in *Miner* is sufficient protection for the defendant when, as here, the "neglect of duty" asserted is nothing more than ordinary negligence. Sun 'n Sand's allegations do not require the conclusion that UCB suffered an irrevocable change of position, and they therefore state a cause of action for the recovery of money paid under a mistake of fact. UCB will, of course, have an opportunity during further proceedings to defeat recovery by proving that it has in fact changed its position to such an extent that requiring it to refund the money would be unjust.

UCB argues finally that recovery for the first three checks issued is barred by the three-year statute of limitations of Code of Civil Procedure section 338, subdivision 4. The limitations period does not begin to run, however, "until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (*Id.*) We must therefore determine when "discovery" occurs for purposes of this subdivision.

In a long line of cases we have held that a cause of action for fraud or mistake accrues, and the limitations period commences to run, when the aggrieved party could have discovered the fraud or mistake through the exercise of reasonable diligence. In *Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 437 [159 P.2d 958], we explained that since the provision tolling operation of the statute until discovery is an exception, the plaintiff "must affirmatively excuse his failure to discover the fraud

within three years after it took place, by establishing facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual *or presumptive knowledge* of facts sufficient to put him on inquiry." (Italics added.) (See *Bainbridge* v. *Stoner* (1940) 16 Cal.2d 423, 430 [106 P.2d 423]; *Vai* v. *Bank of America* (1961) 56 Cal.2d 329, 343 [15 Cal.Rptr. 71, 364 P.2d 247]; *Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 669, fn. 7 [79 Cal.Rptr. 106, 456 P.2d 674]; *People* v. *Zamora* (1976) 18 Cal.3d 538, 561-562 [134 Cal.Rptr. 784, 557 P.2d 75]; see also *Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 129-131 [125 Cal.Rptr. 59].)

It is apparent from Sun 'n Sand's allegations that the delay in discovering its mistake and commencing this action was attributable to its own negligence. If it had examined its bank statements with reasonable care, Sun 'n Sand would have discovered that its employee was altering the checks issued to UCB; reasonable inquiries following such discovery would have revealed the employee's fraudulent scheme. That its dishonest employee may have concealed her perfidy by manipulating and destroying records does not exonerate Sun 'n Sand of its negligent omission. We made clear in *Basch* v. *Bank of America* (1943) *supra,* 22 Cal.2d 316, 327-328, that an employer is charged with the knowledge that an honest agent would have gained in the course of a reasonably diligent examination; we explained that "this rule reasonably imposes upon the depositor the further duty of properly supervising the conduct of his trusted employee . . . ." Sun 'n Sand's failure to discover its mistake within three years of the issuance of the first three checks thus derived from its failure to discharge with reasonable care its duty to supervise its employees. Because it permitted the fraud to be concealed by its lack of reasonable supervision, Sun 'n Sand may not assert such concealment to justify its delay in commencing this action. The exception tolling operation of the statute of limitations is therefore inapplicable, and recovery for the first three checks on a theory of mistake of fact is barred.

## IV

Finally, in its fourth cause of action Sun 'n Sand alleges that UCB "had full knowledge that it was payee on [each] check" and "knowingly failed to advise" Sun 'n Sand that neither the bank nor Sun 'n Sand's employee had any right to, or interest in, the money represented by the checks. This failure to advise, it asserts, constituted a "fraudulent misrepresentation" because the bank had an obligation to inform Sun 'n Sand of such apparently incongruous circumstances.

Although Sun 'n Sand's allegations are of uncertain import, they clearly do not state sufficiently that UCB knew that neither it nor the employee presenting the checks had any right to negotiate them, or that UCB acted in any manner with an intent to deceive. An action for fraudulent misrepresentation lies only when the defendant is charged with knowledge of falsity and an intent to deceive (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 586, 588, at pp. 2224-2227); because Sun 'n Sand does not adequately allege either of these essential elements, its fourth count fails to state a cause of action.

## V

In sum, we reach these conclusions:

The first count states a cause of action for mistake of fact; recovery for checks one through three is barred by the limitations period of Code of Civil Procedure section 338, subdivision 4, but Sun 'n Sand may seek to recover the full amount of checks four through nine.

The second, third, and fourth counts fail to state facts sufficient to constitute a cause of action.

The fifth count states a cause of action for negligence; recovery for checks one through three is barred by the limitations period of Code of Civil Procedure section 338, subdivision 3, but Sun 'n Sand may seek to recover the full amount of checks four through nine.

The sixth count states a cause of action for breach of the warranty against material alteration; recovery for checks one through eight is barred by the preclusion of section 4406, subdivision (4), but Sun 'n Sand may seek to recover the difference between the raised amount at which check number nine was negotiated and the original amount in which it was issued.

The judgment (order of dismissal) is reversed as to the first, fifth, and sixth counts, and affirmed as to the second, third, and fourth counts.

Tobriner, Acting C. J., concurred.

Richardson, J., concurred in the result.

**CLARK, J.,** Concurring and Dissenting.—Although as a practical matter I may reach the same result as the majority, I cannot agree with the majority's rationale.

Because the judgment is based on a demurrer sustained without leave to amend, plaintiff's allegations are deemed to be true: As a duty of her employment with Sun 'n Sand, Eloise Morales prepared checks for signature by a corporate officer. Over a three-year period Morales prepared nine checks payable to United California Bank (UCB), wherein she maintained a personal account. She obtained authorized signatures on these checks from a Sun 'n Sand officer who believed they represented small sums his company owed to UCB. No such debts were in fact owed. Morales then altered the checks, increasing the amount in each case to several thousand dollars, and presented them to UCB for deposit into her personal account. UCB credited Morales' account, endorsed the checks and presented them to Union Bank, the drawee, who paid them and charged Sun 'n Sand's account for their face amounts.

Sun 'n Sand filed its original complaint against both Union Bank and UCB on 4 March 1974. The amended complaints alleged six causes of action. UCB demurred on the grounds (1) each of the six counts fails to state facts sufficient to constitute a cause of action, and (2) various statutes of limitation bar some or all of the causes of action alleged. The court sustained the demurrer on the grounds stated, "and in particular and in addition, because United California Bank, as payee, owed no duty to plaintiffs which was breached."

When a bank named as payee on a check receives and negotiates the check, it holds the funds for the use of the drawer, and if the bank diverts the funds to an unauthorized third party, including the drawer's employee, it does so at its own risk. (*Pacific Finance Corp. v. Bank of Yolo* (1932) 215 Cal. 357 [10 P.2d 68] and *Pacific Indemnity Co. v. Security First Nat. Bank* (1967) 248 Cal.App.2d 75 [56 Cal.Rptr. 142].)

In *Bank of Yolo* plaintiff finance corporation drew drafts payable to the order of defendant bank for the purchase of automobiles as part of a security transaction to finance an automobile dealer. It was contemplated that the bank would forward the funds to the car seller. Plaintiff on one occasion entrusted the delivery of the drafts to the dealer who endorsed them as if he were the payee and forwarded them to defendant for deposit in his personal account. In allowing the drawer's recovery from the payee bank, this court relied chiefly on *Sims* v. *United States Trust*

*Co.* (1886) 103 N.Y. 472 [9 N.E. 605, 606], where the court on similar facts stated: " 'The use of the defendant's name as payee of the check indicated the drawer's intention to lodge the moneys in its custody and place them under its control, and nothing further than this was inferable from the language of the check. . . . The [bank] could have refused to receive the deposit, or act as . . . agent . . . but having accepted the office of so doing, it was bound to keep [the drawer's] moneys, until it received his directions to pay them out. The language of the check making the funds payable only upon the order of the defendant imposed upon it the duty of seeing that they were not, through its agency, improperly disbursed after it had received them. [The bank] could not safely pay out such funds except under the direction of their lawful owner.' " (*Pacific Finance Corp.* v. *Bank of Yolo, supra,* 215 Cal. 357, 360-361.)

On facts nearly identical to those at hand, the court in *Pacific Indemnity Co.* v. *Security First Nat. Bank, supra,* 248 Cal.App.2d 75, reached the same conclusion. The court noted that in cases involving banks named as payees, the following rules are well established: " 'It is generally held that a check or draft drawn to the order of a bank precludes the diversion of the proceeds of it to a use other than that of the drawer, and that such diversion can be justified only by proof of authority from the drawer. It is held to be immaterial that the drawer may have been negligent in signing the check, and inquiry will not protect the bank where it is made only of the person tendering the check. Thus it appears that a drawee bank which is also the payee is liable to the drawer for paying the check to a third person or to the drawer's agent who has no actual or apparent authority from the drawer to collect its proceeds, or for diverting its proceeds to uses other than those of the drawer, without specific instruction from the drawer to that effect; but that if the drawer has clothed his agent with apparent authority to receive the proceeds of such check, the bank is not negligent in, and is not liable to the drawer for, paying, in reliance upon such apparent authority, the proceeds of such check to such agent, or appropriating them to uses directed by the agent contrary to his actual authority, if the agent should misappropriate such proceeds.' (10 Am.Jur.2d, Banks, § 560, pp. 529-530.) [¶] 'Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment.' (9 C.J.S., Banks and Banking, § 340, p. 683.)" (*Id.,* at pp. 93-94.)

The rights and liabilities of the payee of a check and those of the drawer of a check are ordinarily determined by reference to the contract or obligation, express or implied, which gave rise to the issuance of the check. When a person pays another to whom no debt is owed, the latter may not retain the proceeds for his use but must return them to the paying party. (E.g., 1 Witkin, Summary of Cal. Law (8th ed. 1973) p. 50.) The fact that the paying party uses a check will not preclude recovery of the payment any more than cash payment will preclude recovery. Additionally, *Bank of Yolo* and *Pacific Indemnity Co.* make clear that a payee bank absent authorization to pay may not properly assert as a defense that it paid to the drawer's employee who delivered the check.

Although those two cases did not involve altered checks, the fact that the checks were raised furnishes no basis for refusing to follow the cases. The payee bank upon negotiating the checks obtained the raised amounts, and the drawer was charged in those amounts. Had UCB properly held the funds for the direction of the drawer-plaintiff, the latter would have suffered the loss of neither the original amounts nor the raised amounts. All of the drawer's loss flowed directly from UCB's failure to hold the funds for the direction of the drawer. It is thus immaterial that the checks were raised prior to presentation to the bank.

UCB contends the one-year notice requirement of California Uniform Commercial Code section 4406, subdivision (4), and the one-year statute of limitation of Code of Civil Procedure section 340, subdivision 3, apply to this action. Although I am of the view that these sections are inapplicable to the instant case, I reach this result on a different theory from the majority.

California Uniform Commercial Code section 4406 contemplates a system of duties between a depositor and his bank. Subdivision (1) provides that when a bank makes available to its customer statements of account and paid items, the customer has a duty to reasonably examine the statements and items and promptly notify the bank of any forgery or alteration. Under subdivision (2), if the customer fails to comply with the above duty, he is precluded from asserting against the bank a claim for payment of the forged or altered check. However, subdivision (3) provides the customer is not so precluded if he can establish the bank's lack of ordinary care in paying the item. Subdivision (4) provides a customer is precluded in any event if he does not discover and report any

forgery or alteration within one year from the time the statement and items were made available to him.[1]

Code of Civil Procedure section 340, subdivision 3, provides a plaintiff must file within one year "An action . . . by a depositor against a bank for the payment of a forged or raised check, or a check that bears a forged or unauthorized endorsement . . . ."[2]

The foregoing statutes have no application where the payee's liability arises from breach of its obligation not to divert the drawer's funds to some third person. In such case, the action is based on the wrongful

[1]Section 4406 provides: "(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after the discovery thereof. [¶] (2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subdivision (1) the customer is precluded from asserting against the bank [¶] (a) His unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and [¶] (b) An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration. [¶] (3) The preclusion under subdivision (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s). [¶] (4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subdivision (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or any unauthorized indorsement, and if the bank so requests exhibit the item to the bank for inspection, is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration. The burden of establishing the fact of such unauthorized signature or indorsement or such alteration is on the customer. [¶] (5) If under this section a payor bank has a valid defense against a claim of a customer upon or resulting from payment of an item and waives or fails upon request to assert the defense the bank may not assert against any collecting bank or other prior party presenting or transferring the item a claim based upon the unauthorized signature or alteration giving rise to the customer's claim."

[2]Section 340 provides in pertinent parts: "Within one year: . . . [¶] 3. An action for libel, slander, assault, battery, false imprisonment, seduction of a person below the age of legal consent, or for injury to or for the death of one caused by the wrongful act or neglect of another, or *by a depositor against a bank for the payment of a forged or raised check, or a check that bears a forged or unauthorized endorsement,* or against any person who boards or feeds an animal or fowl or who engages in the practice of veterinary medicine as defined in Business and Professions Code Section 4826, for such person's neglect resulting in injury or death to an animal or fowl in the course of boarding or feeding such animal or fowl or in the course of the practice of veterinary medicine on such animal or fowl; . . ." (Italics added.)

diversion—not on forgery or alteration. As discussed above, the alteration of the checks does not affect UCB's liability as payee of the checks, and the fact that the drawer could recover not only for the wrongful diversion of its funds but also part of the funds for the alterations should not limit its right to recover for the diversion.[3]

I agree with the majority opinion insofar as it concludes that action on the first three checks may be barred if plaintiff fails to excuse his failure to discover the fraud within three years after it took place. (*Ante,* pp. 701-702.)

I would reverse the trial court's judgment for the reason Sun 'n Sand has stated facts sufficient to constitute a cause of action against UCB.[4]

---

[3]I cannot agree with the majority's conclusion that California Uniform Commercial Code section 4406, subdivision (4) and the one-year limitation on depositor actions of Code of Civil Procedure section 340, subdivision 3, are applicable only to warranty actions and are not applicable to mistake and negligence actions. As pointed out above, section 4406, subdivision (1), imposes a duty upon the bank's customer to promptly notify the bank of forgeries and alterations after the statement and items are received. Subdivision (2) precludes customers' claims when such duty is breached. Subdivision (3) provides the customer is not so precluded if the bank failed to exercise ordinary care. Subdivision (4) provides: "[w]ithout regard to care or lack of care of either the customer or the bank," a customer action will be barred unless notice of forgery or alteration is given within one year. It is apparent that the main, if not the sole, application of subdivision (4) is to cases where the bank has been negligent. Where the bank is not negligent, subdivision (2) ordinarily will be controlling. To conclude, as the majority does, that subdivision (4) does not apply to negligence actions is to ignore the surrounding provisions and the placement of the subdivision as well as the plain import of the words quoted above, showing that the one-year limitation is to apply whether or not there is negligence.

Similarly, the one-year limitation on depositor actions of Code of Civil Procedure section 340, subdivision 3, shows in context that it is applicable to negligence actions. Both the preceding and subsequent provisions in the subdivision deal with actions based on "neglect." (See fn. 2.)

I am satisfied that both subdivisions are applicable to actions against *drawee* banks for paying forged or altered checks whether the action sounds in negligence, mistake, or breach of warranty. They are not applicable here because the action is against the payee.

[4]Because I adopt a different approach from the majority, I do not reach many of the issues addressed by their opinion. However, I am compelled to comment on the opinion's cursory referral to the application of the comparative fault doctrine enunciated in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]. While the opinion states *Li* would apply to the negligence cause of action, it proceeds to hold the customer's lack of care would not be a defense to warranty or mistake causes of action. This conclusion relying upon the form of the action seems contrary to *Daly* v. *General Motors* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162], where we held comparative fault is not limited to negligence actions but applies to strict liability actions.

I would reserve for future determination whether comparative fault is limited to personal injury and property damage cases or applies to commercial transactions as well, and, if so, whether the form of the action should govern *Li*'s applicability.

**SULLIVAN, J.,*** Concurring and Dissenting.—While I am in general agreement with the majority opinion, I do not endorse its rationale in all respects. Basically, I agree with the majority's conclusions that the first, fifth and sixth counts of plaintiffs' second amended complaint state facts sufficient to constitute a cause of action, subject to limitations on the amount of recovery based on applicable statutes of limitation. I further agree with their conclusions that the second, third and fourth counts fail to state facts sufficient to constitute a cause of action.

It is noteworthy, however, and the record so discloses, that upon the filing of the second amended complaint, defendant did not file a new demurrer. Instead, the parties stipulated in writing that defendant's "general demurrers" to plaintiffs' first amended complaint might "be deemed to be general demurrers to Plaintiffs' Second Amended Complaint" and that "Plaintiffs cannot further amend their complaint beyond the Second Amended Complaint." Although defendant interposed both general and special demurrers to the first amended complaint, I would construe the above stipulation to mean that defendant was incorporating by reference only its general demurrers and was abandoning its special demurrers. In view of this construction, I would respectfully suggest that on remand the trial court is under no obligation to rule on the points presented by the special demurrers to the first, fifth and sixth counts under the rule set forth in *Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 425-426 [282 P.2d 890]; *Wennerholm* v. *Stanford Univ. Sch. of Med.* (1942) 20 Cal.2d 713, 720 [128 P.2d 522, 141 A.L.R. 1358]; and *Guilliams* v. *Hollywood Hospital* (1941) 18 Cal.2d 97, 104 [114 P.2d 1]. Since plaintiffs stipulated that they cannot further amend their complaint, I see no reason to remand the second, third and fourth counts.

I therefore agree that the judgment (order of dismissal) should be affirmed as to the second, third and fourth counts and reversed as to the first, fifth and sixth counts, and; that as to said three counts last mentioned, the cause be remanded to the trial court with directions to overrule the demurrers and to allow defendant a reasonable time within which to answer.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.