FEDERAL INSURANCE COMPANY and
Aetna Insurance Company, Plaintiffs,

v.

BANCO DE PONCE, Defendant.

Civ. No. 80–2317 (JP).

United States District Court,
D. Puerto Rico.

March 23, 1984.

Hendler & Murray, New York City, Stanley Segal Ramírez, Segal & Latimer, San Juan, P.R., for plaintiffs.

George Harris, Burke & Burke, New York City, Francisco Fernández Carbia,

Dubón, Dubón & Vazquez, San Juan, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action commenced by plaintiffs against defendant in the Supreme Court of the State of New York, County of New York, by personal service of summons and complaint. On petition by defendant, the action was removed under 28 U.S.C. § 1441, to the United States District Court for the Southern District of New York, and subsequently transferred to this Court on the basis of forum non conveniens, 28 U.S.C. § 1404(a). Jurisdiction is not disputed and is predicated upon diversity of citizenship. Accordingly, applicable substantive law is that of the Commonwealth of Puerto Rico.

Plaintiffs are seeking to recover from defendant for losses suffered by plaintiffs' assignor, International Charter Mortgage Corporation (ICMC), as a result of an embezzlement scheme executed by one Jorge Pagán Lizardi, at all times relevant hereto, Assistant Comptroller and Assistant Vice-President of ICMC. The plaintiffs Federal Insurance Company and Aetna Insurance Company are insurance companies who were the fidelity insurers of ICMC at the time of the events in question. ICMC is a Delaware corporation, formed in 1966, with its principal place of business in Hato Rey, Puerto Rico, engaged in the business of providing real estate financing, primarily long-term residential lending. Defendant, Banco de Ponce, is a commercial banking institution chartered pursuant to the laws of the Commonwealth of Puerto Rico and authorized to do business therein.

Trial by jury having been waived, the Court scheduled a bench trial for June 14, 1982, at which time the parties appeared represented by counsel and submitted for approval by the Court a comprehensive stipulation, whereby all pertinent facts were set forth and the documentary evidence marked and admitted. The parties then requested, and the Court allowed, that the legal issues be taken under advisement by the Court on the basis of said stipulated record, in lieu of trial. The agreement, as drafted and signed by the parties, is as follows:

a) to submit the case for decision by the Court on the basis of a stipulated record;

b) the stipulated record is comprised of the pleadings, the pre-trial order with the exhibits, the depositions on file and the trial transcript on related case 80–2562; [1]

c) that the sole and exclusive issue for decision by the Court is whether under Puerto Rican Law, and on the basis of the stipulated record, plaintiff is entitled to a judgment against defendant on the basis of conversion, breach of contract and/or monies had and received.

d) that the issue of defendant's possible negligence is immaterial and irrelevant after the fourth cause of action was withdrawn. The parties agree to purge and exclude from the stipulated record any evidence from which the Court may extract or conclude any liability of defendant to plaintiff on the basis of negligence or related thereto;

e) that thirty days from submission of the trial transcript, the parties sumultaneously shall file Memorandum of Law and thereupon rest.

Since the stipulated submission refers to the pre-trial order, it is appropriate to recite the extensive stipulations of facts contained therein, so as to adopt them as this Court's findings of fact:

One Jorge Pagán Lizardi was employed by ICMC from April 14, 1969 to June 29, 1979. His last position with ICMC was Assistant Treasurer and his duties in-

---

1. Case 80–2562 involves the same plaintiffs against Banco Popular de Puerto Rico and the Federal Deposit Insurance Corp. On June 11, 1982, Judge Robert A. Grant filed an Order and Memorandum setting forth his decision in said case. In said decision, Judge Grant found the banks liable for 25% of the losses suffered by plaintiffs using comparative negligence law. Said decision was upheld on appeal in an unpublished opinion entered April 27, 1983. The holding in said related case 80–2562 is not controlling since plaintiffs herein do not seek recovery on the basis of negligence.

volved supervision of corporate accounting under the Vice-President of Finance, including the preparation of tax returns, financial statements and account analyses. Pagán controlled disbursements, check signing, blank and cancelled check custody and bank statement reconciliations for ICMC's general bank account, which was account No. 0447625 at the branch of Citibank, N.A. located at Hato Rey, Puerto Rico. He was an authorized signatory on all ICMC bank accounts. ICMC also maintained, at all relevant times, an account No. 0481580 at the Hato Rey Branch of Citibank, entitled "International Charter Mortgage Corporation, in Trust for Various Mortgagors, VA and FHA loans", which was an escrow account into which ICMC deposited payments made by mortgagors and from which it made disbursements for taxes, insurance and similar charges. The above quoted title of the account was printed on the top of all of the checks for said account. Although Mr. Pagán was not specifically authorized to perform any functions with respect to this account, except for his authority to be one of two persons who would sign checks, Mr. Pagán did in fact assume actual control of the account, including handling check requests for disbursements, check signing and account statement reconciliations, and had access to blank and cancelled checks.

Between on or about October 31, 1977 and on or about April 20, 1979, Jorge Pagán typed sixteen checks drawn on the aforesaid general and trust accounts payable to defendant, Banco de Ponce. All of the said checks drawn on the aforesaid general and trust accounts were made payable to defendant, Banco de Ponce. All of the checks drawn on each ICMC account require two authorized signatories. Mr. Pagán, as an authorized signatory, signed each of the checks and obtained the counter-signature of another officer of ICMC, advising the countersigning officer that the check was needed for some ICMC business purpose. Such as to effect transfers of funds between ICMC accounts. The purpose stated was also typed on the check voucher before the second signature was obtained, but Pagán removed the bottom part of the check voucher before mailing the check to Banco de Ponce, so Banco de Ponce did not have such information when it received the checks and applied them to Pagán's account. The following is a summary of the aforesaid sixteen checks:

| Account | Date | Amount | Signatories |
|---------|------|--------|-------------|
| General | 10–31–77 | $2,674.00 | Pagán/Dixon G. Allen |
| Trust | 11–30–77 | 2,003.80 | Pagán/Tomás Méndez |
| Trust | 12–22–77 | 1,561.44 | Pagán/Tomás Méndez |
| General | 2–01–78 | 1,782.57 | Pagán/Tomás Méndez |
| General | 3–10–78 | 2,364.58 | Pagán/Felipe Franco |
| General | 3–31–78 | 1,907.79 | Pagán/Rafael A. Pérez |
| General | 4–10–78 | 1,680.50 | Pagán/Felipe Franco |
| General | 5–03–78 | 2,670.30 | Pagán/José D. Lebrón |
| General | 5–19–78 | 1,842.86 | Pagán/José D. Lebrón |
| General | 5–30–78 | 2,759.70 | Pagán/Rafael A. Pérez |
| Trust | 12–11–78 | 3,372.18 | Pagán/Tomás Méndez |
| Trust | 1–31–79 | 4,154.67 | Pagán/José D. Lebrón |
| Trust | 2–20–79 | 4,052.34 | Pagán/José D. Lebrón |
| Trust | 3–15–79 | 5,297.79 | Pagán/Tomás Méndez |
| Trust | 4–20–79 | 4,297.79 | Pagán/Tomás Méndez |
| Trust | 1–08–79 | 3,369.32 | Pagán/Tomás Méndez |

Mr. Pagán took the checks, after they were signed and mailed them to Banco de Ponce, together with the payment stub of his Mastercharge Account No. 53010–12–0100–6694, at Banco de Ponce. Each of the checks bears the handwritten entry of said account number on the back thereof and was accepted by defendant and applied to the personal credit card obligations of Pagán. Defendant never requested or received permission or instructions from ICMC to apply the checks to Mastercharge account obligations of Pagán.

ICMC was not indebted to Banco de Ponce for the amounts set forth in the aforesaid checks at the time they were presented to defendant, nor was there any corporate banking contractual relationship between defendant and ICMC. The aforementioned Mastercharge account was established in the name of Jorge Pagán Lizardi by defendant Banco de Ponce on or about November, 1973. The application for said account signed by Pagán and dated November 12, 1973 was maintained in the files of Banco de Ponce at all times relevant hereto.

Pursuant to an application dated June 7, 1977, signed by Jorge Pagán Lizardi and filed with defendant Banco de Ponce, Mr. Pagán applied for an increase in the line of credit on his Mastercharge account to the sum of $1,600.00. Said application was granted by defendant. Mr. Pagán stated on said application that he was the assistant controller of ICMC and that his monthly salary was $1,500.00. The application was maintained in the files of Banco de Ponce at all times relevant hereto. Exhibit "4" are true copies of defendant's records of Mastercharge Account No. 53010–12–0100–6694 in the name of Jorge Pagán Lizardi. As reflected on said records the following is a list of the expenses incurred by Pagán on his Mastercharge Account and payments credited thereto between on or about April 27, 1977 and on or about December 31, 1977.

| Date | Payments | Charges | Amount |
|---|---|---|---|
| 4–27–77 | | Cash Advance | $600.00 |
| 5–26–77 | $300.00 | Cash Advance | 300.00 |
| 5–31–77 | 175.00 | Cash Advance | 175.00 |
| 5–26–77 | | Holiday Inn | 100.00 |
| 5–26–77 | | Holiday Inn | 200.00 |
| 5–26–77 | | Hotel Borinquen | 200.00 |
| 6–01–77 | | Hotel Borinquen | 200.00 |
| 7–15–77 | | Cash Advance | 300.00 |
| 7–05–77 | 44.00 | Holiday Inn | 100.00 |
| 7–15–77 | | Holiday Inn | 150.00 |
| 7–14–77 | | Holiday Inn | 151.00 |
| 7–14–77 | | Hotel Borinquen | 200.00 |
| 7–29–77 | 300.00 | | |
| 8–23–77 | | San Juan Hotel Corp. | 500.00 |
| 8–09–77 | | Hotel Borinquen | 200.00 |
| 8–10–77 | 300.00 | | |
| 8–23–77 | | Holiday Inn | 100.00 |
| 8–17–77 | | Hotel Borinquen | 200.00 |
| 8–23–77 | | Hotel Borinquen | 200.00 |
| 8–26–77 | | Holiday Inn | 200.00 |
| 8–30–77 | 800.00 | | |
| 9–06–77 | | Hotel Borinquen | 200.00 |
| 10–7–77 | | Restaurant Costa Brava | 103.10 |
| 9–29–77 | | Hotel Borinquen | 200.00 |
| 9–29–77 | | Holiday Inn | 300.00 |
| 10–3–77 | 700.00 | | |
| 10–21–77 | | Hotel Borinquen | 200.00 |
| 11–2–77 | | Cash Advance | 800.00 |
| 11–9–77 | | Cash Advance | 500.00 |
| 10–23–77 | | P.R. Sheraton | 300.00 |
| 10–26–77 | | Hotel Borinquen | 200.00 |
| 10–31–77 | 2,674.00 | | |
| 11–3–77 | | Super Pet Center | 53.44 |
| 11–15–77 | | Holiday Inn | 300.00 |
| 12–1–77 | 2,003.80 | | |
| 12–8–77 | | Cash Advance | 800.00 |
| 11–15–77 | | Hotel Borinquen | 200.00 |
| 12–12–77 | | Cash Advance | 500.00 |
| 11–22–77 | | Hotel Borinquen | 200.00 |
| 12–10–77 | | Mundo Joven, Inc. | 26.70 |
| 11–29–77 | | Hotel Borinquen | 200.00 |

| Date | Payments | Charges | Amount |
|---|---|---|---|
| 12–06–77 | | Hotel Borinquen | $.200.00 |
| 12–09–77 | | Holiday Inn | 300.00 |
| 12–30–77 | | Cash Advance | 250.00 |
| 12–29–77 | | Cash Advance | 800.00 |
| 12–20–77 | | Hotel Borinquen | 200.00 |
| 12–27–77 | $1,561.44 | Holiday Inn | 300.00 |
| 12–28–77 | | Hotel Borinquen | 200.00 |
| 12–14–77 | | Hotel Borinquen | 200.00 |

Throughout the year 1978 and through June 1979, Jorge Pagán continued to use the aforementioned Mastercharge Account No. 53010–12–0100–6694 in the same manner; i.e., almost exclusively for the purpose of making similar round-number payments to local hotels and to obtain similar round number cash advances, while simultaneously mailing similar payments into his account. On some occasions, Mr. Pagán incurred such charges at more than one hotel on the same date.

It is a well-known fact that, during the years 1977 through 1979, numerous hotels in Puerto Rico maintained casinos for the purpose of gambling. During this same period, said hotels allowed their customers to pay for their gambling obligations with credit cards such as the Mastercharge cards issued by Banco de Ponce.

Between April 1977 and June 1979, Jorge Pagán used his Mastercharge Account No. 53010–12–0100–6694 at the Banco de Ponce almost exclusively for gambling purposes.

As set forth in the monthly statements of Pagán's Mastercharge account, Pagán exceeded his credit limit as of the date of the statement for the following months: September and October, 1977; February, May, July, August, September, October and November, 1978; and February, April and May, 1979. Closely subsequent to each of these occasions, Mr. Pagán would mail a payment into his account in an amount sufficient as to offset each overage, and stabilize the account. In addition, said monthly bank statements indicate that Mr. Pagán was sometimes incurring monthly expenses in excess of his stated, monthly salary of $1,500.00.

Sometime after June, 1979, Pagán pleaded guilty to criminal charges of embezzlement and received a minimal prison sentence and probation.

Jorge Pagán Lizardi was not authorized by ICMC to use ICMC checks for the payment of his personal obligations and he did so as part of the fraudulent scheme engaged in by Jorge Pagán Lizardi until after he left their employ, and there is no evidence that Pagán had any co-conspirators. The existence of a discrepancy in ICMC's accounts was first discovered by Mr. Carlos González of ICMC in July, 1979, when Mr. González discovered a discrepancy of around $250,-000.00 between the loan inventory of ICMC and the amount contained in the general ledger; the details of the loss were discovered in the course of a subsequent investigation which was concluded on or about February 6, 1980, the date of "Special Report" by the auditors of ICMC, Laventhol & Horwath.

Plaintiffs Federal Insurance Company and Aetna Insurance Company reimbursed ICMC in full for its loss caused by embezzlement of Mr. Pagán and received assignments from ICMC of all of ICMC's claims against the defendant bank. Thus, Federal Insurance Company and Aetna Insurance Company claim all of the rights and causes of action of ICMC's claims against the defendant bank. Thus Federal Insurance Company and Aetna Insurance Company claim all of the rights and causes of action of ICMC against the defendant arising out of the loss caused by Mr. Pagán.

The case is now before us on the basis of said stipulated record and the parties' Memoranda of Law.

In their Brief, plaintiffs urged that the only genuine issue to be resolved with respect to plaintiffs' claim is the legal questions of whether Banco de Ponce was justified in accepting for the personal credit card account of Jorge Pagán Lizardi, sixteen checks totalling $45,741.43 drawn on a general account and a trust account of ICMC, to the order of said bank. (plaintiffs' Brief at 13).

As stated before, the issue of whether the bank is liable to plaintiffs under general negligence law is not before this court. Plaintiffs seek to impose liability on defendant bank on the basis of conversion, implied contract and/or quasi-contractual liability. For the reasons set forth below, we conclude that the facts as stipulated by the parties do not warrant a finding of liability, and that therefore, the action must be dismissed.

■ Inasmuch as plaintiff is suing as subrogee of ICMC, the plaintiff has only the right which ICMC would have if it were suing Banco de Ponce and is subject to any defense which Banco de Ponce could assert against ICMC. *Provident Cooperative Bank v. James Talcott, Inc.*, 358 Mass. 180, 188, 260 N.E.2d 903 (1970).

■ Under Puerto Rico law, a creditor may receive payment of an obligation from a person other than the obligor himself, and such payment effectively extinguishes the obligation without need for the payee to make inquiries as to the third party's purpose in making this payment. Article 1112, Puerto Rico Civil Code, 31 L.P.R.A. 3162.[2]

Although the Civil Code does not specifically address the issue as to whether the creditor must undertake an investigation of the payment, a well known Spanish Civil Law commentator, Manresa, in his treatise *Código Civil Español, Volume IV—Title I,* commenting on this very matter has expressed that Article 1112 compels a creditor to accept valid payment from a third party even if said party was not in privity to the original obligation. In this regard, Manresa writes that in receiving payment from a third party, the creditor "is not authorized to raise any objection" ("no está autorizado para hacer oposición alguna") inasmuch as the creditor's right is limited to the fulfillment of the obligation.

An equal renowned, but more contemporary Civil Law commentator, José Puig

**2.** 31 L.P.R.A. § 3162 provides in part: "Any person, whether he has an interest or not in the fulfillment of the obligation, or whether the debtor knows, approves or is unaware thereof, can make payment.

Brutau, notes as follows in his treatise, *Fundamentos de Derecho Civil,* Tomo I, Volumen II (1959 edition), at page 266.

"Since the Code states, as we have already seen, that 'any person may make payment', it seems that this authority by the third person necessarily implies the same obligation or duty on the part of the creditor to cooperate and receive the payment (so offered). The absence in the Civil Codes of Spain, Cuba and Puerto Rico of a provision to the effect that the creditor may reject the payment made by a third party not interested in the fulfillment of the obligation (which provision does exist in the Civil Code of Phillipines), perhaps indicates that the Code should be so interpreted."

It is, therefore, clear that under the civil tradition in force in Puerto Rico, a creditor is authorized and even compelled to accept payment from a third party.

The preceding notwithstanding, if the creditor accepts payment in a negligent manner, and if by such negligence a third party is harmed, such creditors could conceivably be held liable for its negligence. However, as stated before, negligence is not in issue in the case at bar.

■ Plaintiffs urge that defendant be held liable on conversion. However, pursuant to the law cited above, defendant had no duty to question, challenge, or even inquire as to the third-party payment made by ICMC for the apparent purpose of satisfying the credit card debts of one of its officers. Here was a situation, as contemplated by the Civil Code of Puerto Rico, where a third party was, on the surface, paying the debts of another person. Under those circumstances, a finding of conversion is clearly inappropriate.

■ Conversion in Puerto Rico is an *intentional* tort. 31 L.P.R.A. § 5141. The doctrine is explained by the Puerto Rico Supreme Court as: "not the simple acquisition of another's property, but the mali-

cious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment". *Hull Dobbs Co. v. Superior Court,* 81 P.R.R. 214, 222 (1959); *Heirs of Sorbá v. Viñas,* 49 P.R.R. 31 (1935). The stipulated facts do not justify a finding of malicious or wrongful *intent* by the bank to deprive plaintiffs of property or to otherwise intentionally deprive plaintiffs of any such property.

■ As an alternative legal basis for imposition of liability, plaintiffs cite Article 1795,[3] which regulate the quasi-contractual liability which arises upon collection by mistake of what is not due ("cobro de lo indebido"). Plaintiffs contend that ICMC issued the checks to the bank under the mistaken belief that the checks were in payment of ICMC obligations owing to the bank. (Plaintiffs Brief, at 10). However, such an argument ignores the fact that the Civil Code articles requires a previous finding to the effect that payee had no right to receive payment from a third party. As we have seen before, such is not the case. Moreover, the payments in question were remitted to defendant by ICMC, not under a mistake of fact, but rather because an employee at ICMC was able to perpetrate a fraudulent scheme to embezzle corporate funds.

■ The issue thus boils down to whether plaintiff has established the foundation necessary for quasi-contractual liability to emerge, and whether the facts show unjust enrichment on the part of defendant at the expense of plaintiff. We find that the facts do not justify such a conclusion.

Plaintiffs rely alternatively on the *Sun 'n Sand* case[4], *supra,* as basis for their right to recovery. However, a close analysis of the *Sun 'n Sand* opinion re-

---

**3.** 31 L.P.R.A. 5121, provides as follows: "If a thing is received when there is no right to claim it and which, through an error, has been unduly delivered, there arises an obligation to restore the same."

**4.** *Sun 'n Sand v. United California Bank,* 148 Cal.Rptr. 329, 582 P.2d 920 (1978).

**1394**

veals that the Court imposed liability on defendant bank on said case on the basis of common law negligence. At page 936, said Opinion states:

> "We agree that an attempt by a third party to divert the proceeds of a check drawn payable to the order of a bank to the benefit of one other than the drawer or drawee suggests a possible misappropriation. Accordingly, we conclude that Sun 'n Sand's (plaintiff's) allegations define circumstances sufficiently suspicious that UCB (defendant) should have been alerted to the risk that Sun 'n Sand's employee was perpetrating a fraud. By making reasonable inquiries, UCB could have discovered the fraudulent scheme and prevented its success."

And at page 937:

> "It is settled, however, that the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk (citations omitted). Our conclusion that UCB should have appreciated the indicia of misappropriation is, of course, nothing other than a determination that Sun 'n Sand—loss was reasonably forseeable ..."

Insofar as negligence is not in issue in this case, the Sun 'n Sand analysis is inapplicable.

For the reasons set forth above, the Court finds that the complaint should be DISMISSED in its entirety. JUDGMENT shall be entered accordingly.

The Clerk shall act accordingly.

IT IS SO ORDERED.